**CONGREGATION ETZ CHAIM,**
**Plaintiff–Appellee,**

v.

**CITY OF LOS ANGELES,**
**Defendant–Appellant.**

**No. 02–56487.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 7, 2003.

Filed June 16, 2004.

---

---

Claudia McGee Henry, Senior Assistant City Attorney, Los Angeles, CA, for defendant-appellant City of Los Angeles.

Kathryn Davis (briefed), Susan S. Azad (argued), Latham & Watkins, Los Angeles, CA, for plaintiff-appellee Congregation Etz Chaim.

Before: ALDISERT*, TALLMAN, and RAWLINSON, Circuit Judges.

Opinion by Judge RAWLINSON; Dissent by Judge ALDISERT.

RAWLINSON, Circuit Judge:

The controlling question in this case is whether Appellant the City of Los Angeles (the City) may revoke a building permit issued to Appellee Congregation Etz Chaim (the Congregation) authorizing renovations to a home owned by the Congregation and used as a place of worship. Because we agree with the district court

---

\* The Honorable Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

that Congregation was entitled to rely on issuance of the building permit by the City, we AFFIRM the district court's order lifting the stop-work order issued by the City.

## I.

## BACKGROUND

There is a long history of litigation between the City and the Congregation. The Congregation's initial claim against the City, filed in federal court in 1997, alleged that the City's building permit requirements violated the Congregation's constitutional rights to the free exercise of religion, freedom of speech, freedom of association, freedom of assembly, and equal protection; and violated the Fair Housing Act. Eventually, most of the Congregation's claims were dismissed, but a claim against the City under the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc, remained. Before the district court ruled on the merits of this claim, the parties entered into a settlement agreement (the Agreement), which resulted in dismissal of the Congregation's remaining claim. The district court retained jurisdiction over the matter for the purpose of issuing any future orders necessary to modify or terminate the Agreement.

After the Agreement was signed and the Congregation's action was dismissed, the Congregation submitted its renovation plans to the City's Department of Building and Safety. The plans clearly and explicitly described expansion of the existing home from 3,400 square feet to 8,150 square feet. The Building Department spent approximately three months reviewing the renovation plans in conjunction

with the Agreement. As part of this process, the Building Department demanded numerous changes to the plans, with which the Congregation complied. An attorney in the City Attorney's office who represented the Building Department also reviewed the plans and the Agreement. After this review, the Building Department issued a building and grading permit to the Congregation, and the Congregation promptly began work as specified in the plans.

Approximately one week later, apparently in response to complaints from neighbors, the City issued a stop-work order, giving notice that it intended to revoke the Congregation's building permit. The City described the permit as having been issued "in error or in violation of other provisions of the code and condition [sic] are such that the action should not have been allowed." In response, the Congregation filed a motion seeking enforcement of the Agreement and lifting of the stop-work order. The City countered with its motion to enforce the Agreement and the stop-work order. The district court granted the Congregation's motion, and denied the City's. This timely appeal followed.

## II.

### DISCUSSION

#### A. *Standard of Review*

■ We review a district court's interpretation of a settlement agreement *de novo*. *See Botefur v. City of Eagle Point*, 7 F.3d 152, 156 (9th Cir.1993). Where the district court oversaw the extensive litigation giving rise to the settlement agreement and approved the agreement, we review the district court's interpretation of the agreement with due respect for the district court's superior perspective. *Cf. Labor/Cmty. Strategy Ctr. v. Los Angeles County Metro. Transp. Auth.*, 263 F.3d 1041, 1048 (9th Cir.2001) ("We must give deference to the district court's interpreta-

tion based on the court's extensive oversight of the [consent] decree from the commencement of the litigation to the current appeal.") (citation and internal quotation marks omitted).

#### B. *Estoppel Ruling Against the City*

The district court essentially ruled that the City was estopped from revoking the building permit it had previously issued to the Congregation pursuant to the Agreement. The district court expressly noted that the City's objection to the size of the building under construction "would have made a fine issue for the court, with excellent arguments on both sides, and with [the] result not predictable, *except for the fact that City approved the plans and issued the building permit with full knowledge of the terms of the settlement agreement.*" (emphasis added). The district court presumed that it would have had jurisdiction to resolve the size dispute if the dispute had arisen prior to issuance of the building permit and the incurrence of substantial expenditures by the Congregation in reliance upon issuance of the building permit. However, the district court concluded that once the building permit had issued and the Congregation had substantially relied upon its issuance by commencing construction, the Congregation acquired a vested right under California law that could not be revoked by the City. The district court ruled that the City's issuance of the building permit represented its approval of the building project, size and all. According to the district court, the appropriate time for the City "to take issue with the size of the remodeling was during the extensive and meticulous review, including review of the agreement, which preceded the issuance of the permit and the expensive reliance on it by Congregation."

■ The use of equitable estoppel to resolve land use issues is well-developed in

California law. "The principle of estoppel ... prohibits a governmental entity from exercising its regulatory power to prohibit a proposed land use when a developer incurs substantial expense in reasonable and good faith reliance on some governmental act or omission so that it would be highly inequitable to deprive the developer of the right to complete the development as proposed." *Toigo v. Town of Ross,* 70 Cal.App.4th 309, 321, 82 Cal.Rptr.2d 649 (Cal.Ct.App.1998) (citation omitted). A developer's right to develop property pursuant to its proposed plans vests when: (1) a valid building permit issues and (2) the developer performs substantial work and incurs substantial liabilities in good faith reliance on the permit. *See id.* (citations omitted).

■ The facts of this case provide particularly strong support for the Congregation's estoppel argument. It is unrefuted that the Congregation performed substantial work and incurred substantial liabilities in reliance on the permit. The record reflects that prior to revocation of the permit, the Congregation paid in excess of $21,000 in permit fees and over $15,000 for demolition pursuant to the renovation plans approved by the City.

The City argues that revocation of the permit is proper because the estoppel doctrine cannot immunize the Congregation from compliance with current law as reflected in the Agreement. However, we agree with the district court that the City's argument is significantly weakened by the fact that the size of the building was clearly delineated in the building plans that were reviewed at length and approved by the City. The issuance of a valid building permit by the City was essentially a representation that the Congregation's plans were in accordance with the terms of the Agreement. *See Hock Investment Co. v. City and County of San Francisco,* 215 Cal.App.3d 438, 445, 263 Cal.Rptr. 665 (Cal.Ct.App.1989) (characterizing a building permit as an implied promise "that the proposed use will not be prohibited by ... the regulation in question").

The City does not and cannot allege that the Congregation engaged in fraud or acted in bad faith in presenting its proposed plans to the City for approval. In fact, the City conceded at oral argument that the Congregation submitted both the building permit application and a copy of the Agreement to the Building Department and to the deputy city attorney who advised the Building Department. The City simply cannot dispute that it had ample opportunity to review both the plans and the Agreement before granting the building permit. In view of these facts, we would be hard pressed to find error in the district court's decision to lift the stop-work order.

## C. Interpretation of the Settlement Agreement

■ The City's second argument in support of the stop-work order is that the Congregation failed to comply with the Agreement when the Congregation submitted its permit application to the City. Although the Congregation submitted the application to the Building Department and to the deputy city attorney who advised the Building Department, the City maintains that the Agreement required submission of the application to a specific individual in the Planning Department, Daniel Green.[1]

---

1. The dissent advances an argument that was not made by any of the parties to this case— that the settlement agreement "was tantamount to a deemed-approved conditional use [permit]." *See* Dissent at 1130–31. This position is nowhere supported in the record, the briefs, or the oral argument on behalf of the parties. In short, the dissent seeks to bind the parties to an agreement that not even they

**1126**

To resolve this issue, we must consider two provisions of the Agreement, Paragraph VI and Paragraph XI.

Paragraph VI of the Agreement is entitled "Use of 303 South Highland Avenue" and specifically addresses the building permit application process, requiring the submission of "any required plan and permit application to the *City* . . ." (emphasis added).

Paragraph XI of the Agreement is entitled "Form of Notice," and provides in relevant part: "Any notice, tender, delivery or other *communication* pursuant to this Settlement Agreement . . . shall be deemed to be properly given if delivered, mailed or sent . . . If to the City: Daniel Green, Planning Department . . ." (emphasis added).

The City contends that Paragraph XI required submission of the permit application to Daniel Green, and the Congregation's failure to comply with Paragraph XI voided issuance of the building permit.

The district court rejected the City's argument, ruling that the Congregation's building permit application "was not a notice, tender, delivery, or other communication[.]" Rather, the permit application was a "plan or permit application separately referred to in paragraph VI(A) [and] required to be submitted to the City," rather than to a specific individual. The district court also pointed out the unlikelihood that the City construed Paragraph XI to encompass the permit application given the City's failure to follow Paragraph XI itself when processing the permit application. Finally, it would have been an easy matter for the City to require compliance with Paragraph XI prior to issuing the building permit, as it did with numerous other issues that were addressed during the application process. This is especially true in light of the fact that the Agreement was submitted with the permit application and a deputy city attorney participated in the review of the application, having been provided with his own copy of the Agreement.

We agree with the district court that in these circumstances, the buck stops with the City. Because the Notice provision did not encompass the permit application, we conclude that the Congregation complied with the terms of the Agreement. The permit application was presented and processed in accordance with Paragraph VI of the Agreement, which specifically concerned renovations to the property.

■ There is little indication in the language of the Agreement or in the actions of the parties to support the City's proposition that the notice provision was intended to apply to submission of the building permit application. "[C]ourts must give a reasonable and commonsense interpretation of a contract consistent with the parties' apparent intent." *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal.App.4th 516, 526, 132 Cal.Rptr.2d 151 (Cal.Ct.App.2003) (internal quotation marks omitted). A commonsense interpretation of the Agreement indicates that the Congregation was not required to submit its building permit application to Mr. Green. The building permit application is referenced elsewhere in the Agreement, where the Congregation agrees to "take all necessary actions to restore the property to [residential] use, including submitting any required plan and permit application to the City within ninety (90) days of signing this Settlement Agreement." The City more or less concedes that the Congregation complied with this requirement by

contend was made, hence use of the term "tantamount." We elect in the majority opinion to address the settlement agreement that

was actually agreed upon by the parties and approved by the court.

"submitt[ing] building plans to the City's building officials in order to obtain a building permit as required by state law." It would have made little sense to require the Congregation to submit its plans to Mr. Green, when it is undisputed that he had no authority to approve the plans or to grant a permit. The district court judge, who oversaw the litigation and settlement of this case, and who was presumptively familiar with the processes and procedures of the municipality in which he sits, committed no error in rejecting the City's argument that the Congregation's purported failure to comply with Paragraph XI justified imposition of the stop-work order.

### III.

### CONCLUSION

The district court did not err when it applied equitable estoppel principles and lifted the City's stop-work order. The Congregation's permit application was reviewed and approved by the City and the subsequent renovations were undertaken in reliance upon the issuance of a valid building permit. A commonsense interpretation of the Agreement coupled with an examination of the parties' behavior reflects that the parties did not intend that the Congregation's building permit application be submitted to the individual listed in the notice provision of the Agreement.

**AFFIRMED.**

ALDISERT, Circuit Judge, Dissenting:

I would reverse the judgment of the district court and allow the City of Los Angeles to revoke the building permit. The building permit contravened the Los Angeles Municipal Code and the explicit limitations and directions of the Settlement Agreement entered into by the parties after five years of administrative proceedings and litigation in federal and state courts. Because the building permit was invalid, I would hold that the district court

committed reversible error in applying the doctrine of equitable estoppel against the City of Los Angeles. *See Pettitt v. City of Fresno*, 34 Cal.App.3d 813, 824, 110 Cal. Rptr. 262 (Cal.Ct.App.1973); *Smith v. County of Santa Barbara*, 7 Cal.App.4th 770, 772, 9 Cal.Rptr.2d 120 (Cal.Ct.App. 1992).

### I.

Prior to signing the Settlement Agreement on September 27, 2001, the Congregation Etz Chaim and the City of Los Angeles engaged in extensive administrative proceedings and federal and state court litigation related to the City Zoning Administrator's October 16, 1996 denial of the Congregation's requests for variances and a conditional use permit. At the time of the denial, the Congregation already had been using the 303 South Highland Avenue residence for worship services—in violation of the Los Angeles Municipal Code—for approximately 18 months. Additionally, the property's large fence and front-yard pavement, installed by a previous owner, violated the residential zoning ordinance.

The Zoning Administrator denied the Congregation's application for a conditional use permit and requests for variance because, among other conclusions, a house of worship at 303 South Highland Avenue would not "be in the best interest and convenience of the overall community and its general welfare." The Zoning Administrator cited concerns about inadequate parking, noise and incompatibility with the surrounding single-family residential neighborhood. The Board of Zoning Appeals upheld the denial after adopting the findings of the Zoning Administrator and voicing an additional concern about potential traffic safety hazards at the site. The City Council of Los Angeles sustained the Board's action on July 8, 1997.

The Congregation subsequently filed an action in the United States District Court for the Central District of California, challenging the constitutionality of the City's conduct. On June 1, 1998, the district court dismissed without prejudice the Congregation's claim for administrative mandamus so the Congregation could pursue that claim in the California state courts. In the meantime, the district court stayed federal proceedings on the Congregation's other claims.

The Congregation then filed a petition for a writ of mandate in California Superior Court. The California Superior Court denied the petition, concluding that there was substantial evidence to support the City's findings that led to denial of the conditional use permit. In affirming the judgment of the Superior Court, the California Court of Appeal concluded that the City's action was properly taken in furtherance of a compelling governmental interest—namely, the preservation of single-family neighborhoods.

Following the conclusion of these state court proceedings, the district court lifted the stay of federal court proceedings, and the Congregation filed a Second Amended and Supplemental Complaint for Declaratory and Injunctive Relief. In addition to reasserting its constitutional and statutory claims, the Congregation contended that the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, provided a remedy against the City's permit denial. The RLUIPA claim alone survived the City's motion to dismiss, and the matter was set for pretrial conference.

On September 27, 2001 the parties entered into a Settlement Agreement fully and completely disposing of the Congregation's RLUIPA and other claims against the City. The Settlement Agreement permitted the Congregation to hold prayer services at the 303 South Highland Avenue residence with various use conditions: (1) "The single family use of the property … shall be restored and maintained, including the residential character and architecture …."; (2) double-pane windows must be installed; (3) a proper fence must be installed and maintained; (4) the property must be landscaped and the pavement replaced with a grassy lawn; (5) the Congregation must not post signs or flyers on the premises; and (6) the Congregation must enforce certain specified limitations on the size, type and timing of gatherings and number of cars on the property. The Settlement Agreement also required that the Congregation submit to the City within 90 days "any required plan and permit application" to restore the property to its single-family residential use. Once the City approved those plans, the Congregation was bound to use its best efforts to complete construction in a diligent and timely manner.

The Settlement Agreement stated that the district court would retain jurisdiction over both the subject matter and the parties. Finally, the agreement included a "Form of Notice" provision, which required that *all communications* made pursuant to the Settlement Agreement be made in writing and delivered to the parties' representatives and their respective counsel:

> Any notice, tender, delivery or other communication pursuant to this Settlement Agreement shall be in writing and shall be deemed to be properly given if delivered, mailed or sent by wire or other telegraphic communication in the manner provided in this paragraph, to the following persons:

> If to [the Congregation]: Rabbi Chaim Baruch Rubin, 303 South Highland Avenue, Hancock Park, CA 90036; with copy to Susan Azad, Esq., Latham and

Watkins, 633 West 5th Street, Suite 4000, Los Angeles, CA 90071.

If to the City: Daniel Green, Planning Department, 201 North Figueroa Street, Los Angeles, CA 90012; with copy to Tayo A. Popoola, Deputy City Attorney, Office of the Los Angeles City Attorney, 200 North Main Street, Los Angeles, CA 90012.

Daniel Green has served for 11 years as the Associate Zoning Administrator in the City's Department of City Planning. In that capacity, he has conducted hearings and made discretionary, quasi-judicial determinations on more than 1,800 cases involving, among other matters, conditional uses and variances. Several dozen of these cases implicated properties in the City's Wilshire Plan area where the 303 South Highland Avenue residence is located.

At the time the parties signed the Settlement Agreement, the size of the residence on the property was approximately 3,536 square feet, 20 percent larger than the average house on the same side of the street in that block. After the parties executed the Settlement Agreement, the Congregation applied to the City's Department of Building and Safety for an "addition of 4,423 [square feet] to existing 2 story residential house and addition of 330 [square-foot] 2–car attached garage to existing dwelling. Also remodeled [sic] the entire existing dwelling. Add 657 [square-foot] loft to second floor." The proposed additions would more than double the size of the house.

The Congregation neither submitted its plans to Daniel Green nor notified him of the proposal, but the Congregation did furnish the Department of Building and Safety with a copy of the Settlement Agreement. On March 13, 2002, the Department of Building and Safety issued a building permit. On June 4, 2002, the Congregation began remodeling the existing structure. The "remodeling" consisted of massive destruction of the existing residence to the extent that only two exterior walls remained intact.

## II.

I do not accept the majority's characterization that "[a] commonsense interpretation of the [Settlement] Agreement indicates that the Congregation was not required to submit its building permit application to Mr. Green." *Maj. Op.* at 1126. The Congregation entered into the agreement after losing in its application for a conditional use permit before the Los Angeles City Council, the state trial court, the state appellate court and—on all of its claims but one—the federal district court. A settlement is always a compromise and this one was no exception. It is important to note that the Settlement Agreement accomplished the purpose sought by the Congregation in its 1996 conditional-use permit application—gaining official approval for property uses then taking place in violation of the Los Angeles Municipal Code—while also securing concessions from the Congregation to address the City's concerns about parking, noise and incompatibility with the surrounding neighborhood.

Specifically, the Congregation made three concessions that addressed the concerns expressed by the Zoning Administrator in denying the 1996 conditional-use permit application. First, the Congregation addressed the Zoning Administrator's 1996 concerns about noise and neighborhood disruption by agreeing to install double-pane windows, limit gatherings to daylight hours, limit the number of people who would gather at any one time and not hold weddings, receptions, banquets, funerals or fundraising and daycare activities on the property. Second, the Congregation addressed the Zoning Administrator's

1996 concern about inadequate parking by agreeing to limit the number of cars that would be coming to the property to six on weekdays and zero on the Sabbath and High Holy Days. Finally, the Congregation agreed to take steps to address the Zoning Administrator's 1996 concern about incompatibility with the surrounding neighborhood by restoring and maintaining the single-family use of the property, including submitting any requisite plans and building permit applications within 90 days to the City.

The critical question presented in this appeal—and the one that divides this panel—thus arises: Who or what agency in the City of Los Angeles had sole authority under the Municipal Code to decide whether the plans submitted in the Congregation's 2002 building permit application met the use conditions of the Settlement Agreement—to wit, the property "shall be restored and maintained, including the residential character and architecture"?

The Settlement Agreement's "Form of Notice" provision must be understood in light of the concessions made by the Congregation to address the Zoning Administrator's 1996 concerns that led to denial of the conditional-use permit application. Applying the teachings of *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.,* 107 Cal.App.4th 516, 526, 132 Cal.Rptr.2d 151 (Cal.Ct.App.2003), the "reasonable and commonsense interpretation" of the Settlement Agreement is that it required the Congregation to contact Mr. Green to make the quasi-judicial determination of whether building and remodeling plans complied with the agreement. Indeed, such an interpretation is not only permissible but is compelled by the terms of the Settlement Agreement and the provisions of the Municipal Code.

The Settlement Agreement did not terminate a relationship between the City of Los Angeles and the Congregation. The agreement's immediate effect was two-fold: (1) to terminate five years of administrative and courtroom wrangling; and (2) to provide directions as to the quantum of physical change that would be permitted to the existing residence. The Settlement Agreement specifically contemplated an application for a building permit for the purpose of restoring the 303 South Highland Avenue property to its single-family use. It cannot be controverted that the Settlement Agreement was tantamount to a deemed-approved conditional use for the Congregation to conduct activities on the 303 South Highland Avenue property that otherwise would not have been permissible in the City's R–1 zone.

Under the relevant provision of the Los Angeles Municipal Code, a conditional use is one of various specified "uses and activities [that] may be permitted in any zone, unless restricted to certain zones or locations, if approved by the Zoning Administrator as the initial decision-maker...." *Los Angeles Mun.Code* § 12.24–W (6th ed.). The Code specifically grants authority to the Zoning Administrator to allow, as a conditional use, operation of churches in R–1 zones. *Id.* § 12.24–W.9. As a potential conditional use subject to approval of the Zoning Administrator, operation of a church in an R–1 zone is "not permitted by right." *Id.* § 12.24–A.

Like a conditional use permit under the Los Angeles Municipal Code, the Settlement Agreement, which was signed on behalf of the City by Associate Zoning Administrator Daniel Green, allowed the Congregation to use its property in a way not otherwise permissible under the City's zoning ordinance. In the Settlement Agreement, the Zoning Administrator allowed the Congregation to operate a church in an R–1 zone, much as the Zoning Administrator might have done in a conditional use permit. This use was not

permitted by right. The Settlement Agreement in this case was the negotiated outcome of a five-year process that began when the Congregation applied for a conditional use permit in 1996. Because the Settlement Agreement had the effect of a conditional use permit, the provisions of the Los Angeles Municipal Code relating to building permit applications on deemed-approved conditional use sites are instructive here.

When a property owner has been granted a conditional use permit, the Los Angeles Municipal Code requires that any building or remodeling plans be approved not only by the Department of Building and Safety but also by the Zoning Administrator:

> On any lot or portion of a lot on which a deemed-approved conditional use is permitted pursuant to the provisions of this section, new buildings or structures may be erected, enlargements may be made to existing buildings, and existing uses may be extended on an approved site, as permitted in Subsection L of this section, *provided that plans are submitted to and approved by the Zoning Administrator*, the Area Planning Commission, or the City Planning Commission, whichever has jurisdiction at the time. The Zoning Administrator, the Area Planning Commission, or the City Planning Commission may deny the plans if the Zoning Administrator or the Commission finds that the use does not conform to the purpose and intent of the findings required for a conditional use under this section, and may specify the conditions under which the plans may be approved.

*Id.* § 12.24–M.1 (emphasis added).

The Settlement Agreement effectively allowed the Congregation to make a condi-tional use of the 303 South Highland Avenue property as a house of worship in an R–1 zone. *See id.* § 12.24–W.9 (stating that the Zoning Administrator has authority to allow churches in R–1 zones). Any building or remodeling plans proposed after the Settlement Agreement should have been submitted for approval to the Zoning Administrator. *See id.* § 12.24–M.1. The intent and purpose behind the Los Angeles Municipal Code—that the Zoning Administrator must have an opportunity to determine whether remodeling plans conform with the written findings supporting a conditional use permit—apply equally to the Settlement Agreement. Daniel Green must have been given the opportunity to review the Congregation's building plans to determine whether they conformed with the concessions made by the Congregation in the written Settlement Agreement.

Moreover, the Settlement Agreement specifically required that of the 47,907 employees [1] in the City of Los Angeles, one—Daniel Green, who had the authority to conduct hearings and make discretionary, quasi-judicial determinations—should receive all communications from the Congregation relating to execution of the Settlement Agreement. Copies were to go to the Deputy City Attorney who ostensibly had handled the litigation being settled. In any event, nothing in the record indicates that a clerk in the Los Angeles Department of Building and Safety had the competence or authority to conduct hearings or make quasi-judicial decisions in interpreting a conditional use agreement entered into by the Department of City Planning that settled five years of litigation in state and federal courts.

Accordingly, I do not believe that the issue is even close. The Settlement

---

**1.** *Los Angeles Business Journal Book of Lists 2003 Online, at* http://www.labusinessjoural. com/tobol_labj.htm.

Agreement is a contract that limited the extent of any renovation of the existing residence and imposed a legal obligation on the Congregation to notify Daniel Green of any written communication thereto, including a written application for a building permit. *See Weddington Prods., Inc. v. Flick*, 60 Cal.App.4th 793, 810–811, 71 Cal.Rptr.2d 265 (Cal.Ct.App.1998) (stating that, under California law, "[a] settlement agreement is a contract, and the legal principles which apply to contracts generally apply to settlement agreements"). The Congregation is in breach of the Settlement Agreement[2] for bypassing Mr. Green and the Deputy City Attorney, even though a copy of the Settlement Agreement was attached to the Congregation's building permit application. *See Jensen v. Traders & Gen. Ins. Co.*, 52 Cal.2d 786, 345 P.2d 1, 6 (Cal.1959) ("Parties to a contract may contract on such method of giving notice as they desire and unless public policy is contravened, the contract should be enforced as made.") (internal quotation and citation omitted).

The Settlement Agreement did not allow the Congregation free rein in its building and remodeling plans. Rather, the Settlement Agreement constrained and limited the Congregation by requiring that the "single family use of the property ... shall be restored and maintained." To restore is "to bring back to or put back into a former or original state." *Webster's Third New International Dictionary* 1936 (1966). To maintain is "to keep in a state of repair." *Id.* at 1362. And to keep is "to cause to remain in a given place, situation, or condition," to "maintain unchanged," or to "hold or preserve in a particular state." *Id.* at 1235.

By applying for a building permit that far exceeded the limitations of the Settle-

ment Agreement, the Congregation breached its implied covenant "not to do anything which will deprive [the City] of the benefits of the contract." *Harm v. Frasher*, 181 Cal.App.2d 405, 417, 5 Cal. Rptr. 367 (Cal.Ct.App.1960). By circumventing Mr. Green, the Congregation deprived the City of the Congregation's explicit assurance that it would adhere to the concessions it made in the Settlement Agreement to address the City's concerns about parking, noise and incompatibility with the surrounding neighborhood.

In light of these precepts, the district court erred when it determined that the Settlement Agreement, which was tantamount to a conditional use permit requiring any building permit application to be approved by the Zoning Administrator, did not require the Congregation to give notice to Mr. Green of the Congregation's application for a building permit.

## III.

The district court determined that the Congregation acquired a vested right to complete the renovations by virtue of the Department of Building and Safety's issuance of a permit and the Congregation's incurring of substantial expenditures in reliance on the permit. Accordingly, the Congregation argues that the City can be estopped from denying the validity of the permit. We review the district court's decision whether to apply the equitable estoppel doctrine for abuse of discretion. *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1176 (9th Cir.2000). In my view, abuse of discretion is present here because the district court committed legal error by viewing the building permit as a valid one.

Equitable estoppel does not operate to prevent the government from revoking an

---

**2.** I do not address the issue whether residents of Hancock Park and neighbors of 303 South Highland Avenue are third-party beneficiaries of this contract and thus entitled to breach remedies.

invalid building permit. "[T]he courts have ... consistently concluded that the public and community interest in preserving the community patterns established by zoning laws outweighs the injustice that may be incurred by the individual in relying upon an *invalid* permit to build issued in violation of zoning laws." *Pettitt,* 34 Cal.App.3d at 820, 110 Cal.Rptr. 262 (emphasis in original). That is to say, although equitable estoppel may apply against the government in situations where there is an intervening zoning or legal change, it will not apply where a permit is merely issued in error. *See id.* at 819, 110 Cal.Rptr. 262 ("[A]s a matter of law the City cannot be estopped to deny the validity of a permit or other representations respecting the use of property issued or made in violation of the express provisions of a zoning ordinance.").

In *Pettitt,* the City of Fresno's Planning Department mistakenly issued a permit for the conversion of a residential property to commercial use even though the municipal code prohibited such use in that location. *Id.* Highlighting neighboring residents' "protectable property and personal interest in maintaining the character of the area as established by comprehensive and carefully considered zoning plans ... [,]" *id.* at 823, 110 Cal.Rptr. 262, the California Court of Appeal held that equitable estoppel would not apply against the City because the permit was invalid from the beginning. *Id.* at 824, 110 Cal.Rptr. 262. The court stated:

> To hold that the City can be estopped would not punish the City but it would assuredly injure the area residents, who in no way can be held responsible for the City's mistake. Thus, permitting the violation to continue gives no consideration to the interest of the public in the area nor to the strong public policy

in favor of eliminating nonconforming uses and against expansion of such uses. *Id.* at 823, 110 Cal.Rptr. 262.

Similarly, in *Smith v. County of Santa Barbara,* the California Court of Appeal held that the County was not estopped from revoking a land use permit where it issued the land use permit in error. 7 Cal.App.4th at 772, 9 Cal.Rptr.2d 120. Specifically, the County building department issued a building permit authorizing the installation of more microwave dishes per antenna support tower than it properly could under County zoning regulations. *Id.* at 773, 9 Cal.Rptr.2d 120. In refusing to apply equitable estoppel, the court focused on the "point ... that public policy may be adversely affected by the creation of precedent where estoppel can too easily replace the legally established substantive and procedural requirements for obtaining permits." *Id.* at 775, 9 Cal.Rptr.2d 120. The government is not estopped from enforcing a pre-existing law. *Id.* at 776, 9 Cal.Rptr.2d 120.

In accord are the teachings of *Toigo v. Town of Ross,* 70 Cal.App.4th 309, 321, 82 Cal.Rptr.2d 649 (Cal.Ct.App.1998) ("In California, the developer's right to complete a project as proposed does not vest until a *valid* building permit, or its functional equivalent, has been issued and the developer has performed substantial work and incurred substantial liabilities in good faith reliance on the permit.") (emphasis added).

In the case at bar, the building permit was invalid because it was issued without authority and in violation of the Los Angeles Municipal Code and the governing Settlement Agreement. I already have concluded that the Settlement Agreement required the Congregation to submit its remodeling plans to Daniel Green and that the Congregation did not do so, thereby breaching the terms of the Settle-

ment Agreement and its implied covenant of good faith. Moreover, the Settlement Agreement was tantamount to a conditional use permit under the Los Angeles Municipal Code. The Code requires that plans for changes to a deemed-approved conditional use site must be "*submitted to and approved by the Zoning Administrator* . . . ." *Los Angeles Mun.Code* § 12.24–M.1 (emphasis added). The Congregation did not submit its building permit application to Daniel Green.

Even without the notice problem, the building permit would still be invalid. Because the clerk in the Department of Building and Safety lacked the authority to approve the plans, the teachings of the *Restatement (Second) of Agency* (1958) come into play. Section 164 provides in relevant part: "[A]n agent for a disclosed or partially disclosed principal who exceeds his power in making an unauthorized contract with a third person does not bind the principal . . . ." *Cf. Terminix Co. v. Contractors' License Bd.*, 84 Cal.App.2d 167, 190 P.2d 24, 27 (Cal.Apt.App.1948) (holding that the language of a written contract forbade a company's agent from making oral representations to customers beyond the terms of the contract itself).

Even setting aside the notice requirement that the Congregation failed to meet, the Congregation's execution of the building plans reflected in the building permit violated the specific limitations in the Settlement Agreement. It is true that the Settlement Agreement functioned as a conditional use permit to allow the Congregation to operate a church in an R–1 zone. It is also true that the Settlement Agreement contemplated changes, if approved by the Zoning Administrator, to the existing structure at 303 South Highland Avenue. It does not follow, however, that the Department of Building and Safety had authority under the Settlement Agreement and the Municipal Code to is-

sue a building permit that allowed the Congregation to destroy all but two exterior walls of the existing structure and then build a new structure more than double the size of the original one. Tearing the residence down and then building a new structure more than twice as large simply does not constitute restoring and maintaining "[t]he single family use of the property . . . including the residential character and architecture."

Because the permit was issued in violation of the Settlement Agreement and the Code, the City may revoke the permit. *Los Angeles Mun.Code* § 98.0601(a)(2) ("The Department [of Building and Safety] shall have the authority to revoke any permit, slight modification, or determination whenever such action was granted in error or in violation of other provisions of the Code and conditions are such that the action should not have been allowed."). Equitable estoppel does not apply.

Here, the law did not change from the time before the Department of Building and Safety issued the permit to the time when the City issued a stop-work order. Like the ordinances in *Pettitt* and *Smith*, the Settlement Agreement predated the issuance of the building permit and remains in place beyond it. Significantly, in *Toigo*, the court stated:

> Courts have yet to extend the vested rights or estoppel theory to instances where a developer lacks a [valid] building permit or the functional equivalent, regardless of the property owner's detrimental reliance on local government actions and regardless of how many other land use and other preliminary approvals have been granted.

70 Cal.App.4th at 322, 82 Cal.Rptr.2d 649.

The Congregation made an end-run around the notice provision and applied for a building permit that far exceeded the terms of the operational Settlement Agree-

ment. Applying equitable estoppel "would effectively nullify a strong rule of policy, adopted for the benefit of the public." *Pettitt,* 34 Cal.App.3d at 819, 110 Cal.Rptr. 262 (internal quotations and citations omitted).

Accordingly, I conclude that the Congregation did not possess a vested right in carrying through the renovations to their completion. I conclude also that equitable estoppel does not apply against the City because the public and community interest in preserving the community patterns established by the carefully drafted Settlement Agreement outweighs the injustice that may be incurred by the Congregation in relying upon an *invalid* building permit. The district court abused its discretion in holding otherwise.

For the foregoing reasons, I respectfully dissent.