**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GUATAY CHRISTIAN FELLOWSHIP,
*Plaintiff-Appellant,*

v.

COUNTY OF SAN DIEGO,
*Defendant-Appellee.*

No. 09-56541

D.C. No.
3:08-cv-01406-JM-
CAB

OPINION

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, Senior District Judge, Presiding

Argued and Submitted
February 10, 2011—Pasadena, California

Filed December 23, 2011

Before: Michael Daly Hawkins and Raymond C. Fisher,
Circuit Judges, and Mark L. Wolf, Chief District Judge.*

Opinion by Judge Hawkins

---

*The Honorable Mark L. Wolf, Chief United States District Court
Judge for the District of Massachusetts, sitting by designation.

21157

## COUNSEL

Peter D. Lepiscopo, Lepiscopo & Morrow, San Diego, California, for the appellant.

Thomas D. Bunton, Senior Deputy, County of San Diego, San Diego, California, for the appellee.

## OPINION

HAWKINS, Senior Circuit Judge:

The Guatay Christian Fellowship ("Church") appeals the adverse grant of summary judgment on the Church's claim that San Diego County ("County") enforced a land use regulation in violation of the Church's constitutional and statutory rights under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc ("RLUIPA"). The district court determined the Church's constitutional and statutory claims were not ripe for review because the Church failed to apply for the required land use permit both during the twenty-two years it inhabited the property prior to enforcement efforts and after the district court ordered it to do so as a condition of proceeding with its suit. The district court also rejected the Church's claim that equitable estoppel should apply to bar the County's enforcement efforts. We have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

## I. BACKGROUND

The history of the property and of the dispute between the Church and the County is lengthy, but necessary to our analysis. We summarize the most salient points here.

### A. Facts

#### 1. *The Church*

The Church was founded by Pastor Stan Peterson and his wife Brenda in 1986. It originally held services in the Peter-

sons' home. Soon after its establishment, the Church moved to its current location, a recreation building located in Guatay, California, in the unincorporated portion of San Diego County, on the grounds of the Pine Valley Trailer Park ("Park"), to accommodate the congregation's rapid growth. The first services in the building were held that year and the Church has conducted services on Sundays and Wednesdays since then.

### 2. Zoning and Pre-Church Use of Land

The entire parcel of land on which the building in question stands, including the Park, is zoned "rural residential" under the County's zoning ordinance. Land use permits[1] are required for many uses of the property, including religious assembly, group residences, cultural exhibits and library services, child care services, community recreation, civic assembly, postal services, outdoor sports recreation, camping, and law enforcement services. Before any permit may be granted or modified for these uses, the County must hold a public hearing and make findings on several factors, such as traffic generation, effects on neighborhood character, and the suitability of the site for the type and intensity of the proposed use. The County must also ensure that applicants meet California Environmental Quality Act ( "CEQA") requirements. Use Permits are not required for religious assembly in five of the County's twelve commercial zones and in one of the County's residential zones, where such assembly is permitted as of right, but this building is not located within such a zone.

Built in 1940, and prior to the Church's tenancy, the building it occupies was originally used as a general store and post office but various property owners have submitted applica-

---

[1]The Church and County refer to the permit required for using the property for religious assembly as a "MUP," which stands for Major Use Permit. For simplicity, we refer to the required permit as a "Use Permit," except where quoting directly.

tions to change the property's use over the years. The building also fell into several periods of disuse during the forty-six years before the Church moved in. In 1966, appraisers described the building as "[a]ll open, vacant, in bad condition as to useability without extensive [remodeling]." In 1971 the property owner applied for a Use Permit to convert the property into a recreational campground, proposing to use the existing building as a recreation hall. The third sheet of the plot plan submitted with the 1971 Use Permit application appears to label the building "Exist. Bldg. Rec Hall & Chapel," although the property owner did not submit the application for any purpose related to religious use. The Planning Commission's written approval of the Use Permit refers to the recreation building but does not mention any use as a church or chapel. In September 1978, a new owner, La France L. Bragg ("Bragg"), applied for a minor deviation from the 1971 permit in order to sell a small portion of the land. The second and third pages of the plot plans submitted with this application labeled the recreation hall building as "Exist. Church" and "Exist Bldg (Church)." The plot plan shows a stamp indicating that the plan was initially approved, but the application was ultimately denied because Bragg had pursued the wrong modification process.

Bragg reapplied in December 1978 for modification of the 1971 Use Permit. It appears that the same plot plans and maps submitted with Bragg's initial minor deviation application were submitted again, so the references to "Exist. Church" and "Exist Bldg (Church)" reappear. In 1979, the County's Planning Commission granted this application "as per plot plan," noting that the modification would "serve to constrict, rather than expand, the uses presently on this site," and that the "action will provide a more cohesive use of the existing site." The Commission did not mention including church services among the building's permitted uses. It did, however, expressly state that the modification would expire on February 2, 1980, unless construction or reliance thereon started prior to that date.

Bragg testified that from 1977-80, the recreation building was used as an office, kitchen, and recreation hall for Park guests and was also sometimes rented out for local meetings, but that it was never used as a church during these years. Bragg also testified that before he purchased the property, the recreation hall building "just looked like a—sort of an abandoned building. . . . [I]t didn't seem like it was really used for anything." He confirmed that there was no church in the building when he submitted the plot plans that labeled the hall as an existing church, explaining that his engineers had used the old plot plans to draw up new plans, so the references to a church must have been in error. Bragg stated that the plans he submitted should not have included a reference to the building's use as a church, because "[t]here was no sign of a church when we bought it. It was sold to us as a rec hall, and that's how we treated it."

In 1981, new owners of the property applied for another modification of the Use Permit to expand the recreation building's permitted uses to include live country western music and beer and wine sales. The plot plan and map submitted with this application identified the building as "Existing Rec. Hall," but did not mention a church or chapel. The Planning Commission approved the application in 1982, granting, "as per plot plan dated November 3, 1981 . . . to allow for the conversion of the existing recreational hall for on and off site sale of beer and wine, and allow live music and entertainment." The Commission required the owner to submit a Department of Planning and Land Use compliance survey, proof of water and sanitation tests, and evidence of permits for construction. It also noted that the permit would expire on July 16, 1984 "unless construction or use in reliance on this major use permit modification has commenced" prior to that date.

However, it appears that the building was never used as a country western bar, as the permit modification stipulated. Cheryl Rice ("Rice"), the Church's secretary, testified that in

1986, when the Church first began meeting in the building, the building was empty and "very filthy, a lot of junk in it, falling apart." It needed painting and repairs, and someone from the Park told Rice that the building had not been used for ten years. Cheryl Rice's husband, Charles Rice, testified that the recreation hall was "unfinished, very dirty, [had] been empty a long time" by 1986. Pastor Peterson testified that the building was in dilapidated condition when he first saw it, and the Church had to complete many repairs to the building to prepare it for use, including finishing some of the walls. Consistent with Rice's testimony, Pastor Peterson also testified that the building had not been used for anything, to his knowledge, for ten years before the Church moved in.

Other than the plot plans submitted with applications for non-religious uses labeling the building as an existing church, there was no testimony or evidence from any party establishing that the recreation hall had actually been used for religious purposes prior to the start of the Church's tenancy in 1986.

### 3. Church Use, Repairs, and Taxes

Over the years, the Church made significant repairs and renovations to the recreation building and surrounding area, replacing roofs, enlarging an existing bathroom, erecting a parking barrier, painting inside and out, paving the parking lot area, and pouring cement for a basketball court. It also installed air conditioning, heating units, drywall, lighting systems, a new electrical system, sound-proofing, a sound system, and new flooring. The Church also took over and renovated other buildings at the Park in order to establish a main office and a children's classroom building.

In July 2000, the County issued an electrical permit to Doug's Electric to complete work on the property. The permit states that the scope of the work was to "upgrade Elec. To 200A for existing church." There is no evidence in the record that any of the Church's representatives knew that the County

had issued the permit to Doug's Electric, and there is no evidence that the Church sought construction or electrical permits from the County for any of the other renovations it made to the property.

Additionally, the Church has permitted others to use its facilities for non-religious purposes over the years, including for polling stations, government food distribution programs, town meetings, Alcoholics Anonymous meetings, Harvest Festival activities, water department meetings, and a senior lunch program.

The Church has paid taxes for fixtures on the property since 1993. These are unsecured personal property taxes, not real property taxes. An Assessor's Parcel Number is associated with the real property, but that number belongs to JFAJ Properties, LP—the current owner's partnership—to whom the taxes are also billed.

### a. *Prior History of Church Use Disputes and Permit Applications*

It appears that the Church and the current property owner, John O'Flynn ("O'Flynn"), twice proceeded partway through the County's Use Permit application process. However, on neither occasion did they obtain approval.

**1986 Attempted Application.** Soon after the Church moved into the recreation building at the Park, Rice called the County "to make sure [the Church was] abiding by all the rules and laws." At that time, a County employee informed Rice that the Church would have to submit a Use Permit application. Accordingly, Rice prepared and attempted to submit an application in person to the County offices. Rice attested that she spoke with several people at the County offices, but ultimately did not turn in the application. She could not recall any of the individuals with whom she spoke. She testified that "[t]he last person I talked to said to take my

paperwork back, that things are too confusing out there, don't worry about it." Rice did not try to turn in another application, and does not know what happened to the original completed application she tried to submit in 1986.

**1988 Incomplete Application Process.** O'Flynn bought the property in December 1986, shortly after the Church began using the building. In March 1988, O'Flynn submitted an application for a minor deviation from the approved Use Permit in order to relocate six of the Park's RV trailer sites. The plot plan submitted with this application labeled the building as a recreation hall and did not mention a church.

After O'Flynn submitted the application, Ben Graeme ("Graeme"), a Senior Planner in the Department of Planning and Land Use, inspected the Park. He later informed O'Flynn's partner, who had submitted the plans on behalf of the Park, that the Department had disapproved the proposed minor deviation plan because of the Park's "bad history" and because the existing recreation hall was being used as a church.

A meeting was held on April 25, 1988 at the County's Regional Center to discuss O'Flynn's request to validate the relocation of the trailer spaces and to grant a Use Permit authorizing the Church's use of the recreation hall as a church. O'Flynn took the meeting notes. At the meeting, George Hatton, O'Flynn's business partner, explained that the building designated as a recreation hall had never been used as such, but was instead a "dilapidated building used as a storeroom." He elaborated that the previous owner's request to use the recreation hall building as a restaurant and bar had been rejected because of septic problems at the Park. Rice related her previous effort to obtain a permit, and the unidentified County employee's 1986 statement that "the easier course would be just to continue operating as is" without submitting the permit application.

Bob Stewart ("Stewart"), a County employee, stated that "it seemed that the Church would probably require a major use permit." Pastor Peterson said that the Church had the funds to proceed with a Use Permit and was "very willing to proceed." Stewart also stated that it was possible that the existing Use Permit for the Park could be revoked due to the use of the proposed recreation hall as a church, although he thought it unlikely because of the "outrage" it might cause among the residents. He then telephoned Graeme, who "suggested [the Church and Park] needed to apply for a major modification to the existing use permit, which would include . . . [u]se of the hall as a church." Stewart noted that parking might be an obstacle to securing a Use Permit for the Church.

In his meeting notes, O'Flynn included as a plan of action that, "[s]ince [use of the building as a church] apparently needed a major use permit, apply for major use permit with John O'Flynn supplying a percentage of the funds needed for the application."

No Use Permit application was ever completed. In September 1988, O'Flynn sent a letter to the Department of Health Services disputing the department's requirement of a water engineering report for the water system at the Park. O'Flynn noted that he was ready to proceed with the Use Permit process, including by providing the necessary fee payment, but that the Department had indicated there would be no signoff for the application until the required report was submitted. In his letter, O'Flynn argued that a study of the water system was unnecessary since there was no plan to add any hookups to the water system. He noted, "[i]n the case of the relocated trailer spaces and the church, we are attempting to legalize an existing situation."

The Department responded in November 1988 with a note treating O'Flynn's letter as an appeal of the requirement for the engineering report on the Park's water system. In its response, the Department's public health engineer conveyed

to O'Flynn the Department's determination that "the existing wells and reservoir, are adequate for current domestic needs which include the use of the recreation building for a 200 person church and relocation of the 7 recreational vehicle sites." The letter did *not* state that the Use Permit was therefore granted, or that the County had made any final determination on the application's merits. The Chief of Land Use and several other Planning and Land Use employees were sent copies of the letter.

The Church proffers no record evidence demonstrating that a completed Use Permit application was submitted to the Department of Planning and Land Use, either before or after O'Flynn's exchanges with the Department of Public Health. In fact, the County denied O'Flynn's minor deviation application in March 1989, stating that even though he had been informed that this would require a Use Permit, O'Flynn had nonetheless failed to apply for one from the time of the April 1988 meeting to the time of the letter's writing.

According to Rice, after 1988 and up to the time of the enforcement actions at issue here, the Church made no attempt to file another Use Permit application. Nonetheless, the Church continued to use the property for religious assembly for the next twenty years.

b. *Enforcement of the County's Regulations*

**The Park's April 2008 Notice of Violation.** The County issued a Notice of Violation ("NOV") to the Park via O'Flynn on April 16, 2008. The NOV identified numerous violations, including that the number of mobile homes exceeded the permitted number of sites, occupants remained past the ninety-day permitted limit, septic system issues, illegal structures, and excessive vegetation on some of the mobile homes. It also

noted that the recreation hall had been "illegally converted for use as a church."[2]

The NOV advised that the use of the building could not be changed without a Modification of Use Permit ("MOU"). It further advised that "[r]eligious assembly is not allowed in an RR-1 Zone without an MUP," and stated that O'Flynn was "required to notify the church staff to cease using the building for religious assembly within 30 days of the notice." In addition, the NOV required O'Flynn to notify the Church that continued use of the property for religious assembly could result in penalties of up to $2,500 per day for each day beyond the thirty-day period. It also stated that O'Flynn was responsible for ensuring that the Church complied, and his failure to take legal action against the church would result in the County holding him liable for the Church's violations of zoning regulations.

**The Park's May 2008 Letter.** On May 1, 2008, Charles LePla ("LePla"), counsel for the Park, sent a letter to the County, taking the position that the Use Permit allowing the sale of beer and wine and live music in the building also permitted religious assembly there. LePla asserted that this was true because "[t]here is no material distinction between religious assembly and recreational assembly as land uses." Arguing that distinguishing between assembly for listening to popular music and assembly for listening to religious music was an unconstitutional content-based manner in which to regulate, LePla "request[ed] that the County concur that religious assembly is within the scope of community assembly authorized by the use permit[.]"

---

[2]Although it is ultimately immaterial to our analysis at this stage of the proceedings, we note that it is unclear from the record how the County became aware of the Church's continued violation of the zoning regulation, or why the County chose to send the NOV in 2008 rather than at some earlier date following O'Flynn's failure to submit a completed application.

**O'Flynn's Notice to Residents and Church Members.** O'Flynn sent a notice to Park residents and Church members on May 23, 2008, which relayed that the County had told him that the recreation building could not be used for Church assembly. However, O'Flynn did not advise the Church to stop using the building; he instead asserted that the County was wrong and advised that he and his lawyer were "attempting to work the disagreement out with the county."

**County's May 30, 2008 Letter to Church.** On May 30, 2008, the County sent a letter to Pastor Peterson stating that O'Flynn's letter had insufficiently informed him, and advising him that because the property was not zoned for religious assembly and no permit had been obtained to allow such use, "the continued operation of [the C]hurch for that purpose is illegal." The letter also stated the County had no choice but to take legal action against the Church unless it ceased conducting religious assembly on the property until a permit was granted.

**Cessation of Services.** Pastor Peterson testified that in response to this letter, fearing prosecution or suit by the County, the Church ceased all religious assembly on the property. It conducted Sunday services in members' homes and in other neighborhood churches between June 6, 2008 and August 10, 2008, and again from August 17, 2008, through November 16, 2008. It ceased holding Wednesday services during this time period.

In late May or early June 2008, Pastor Peterson called Eliot Alazraki ("Alazraki"), Deputy County Counsel, who—according to Pastor Peterson—confirmed the contents of the May 30, 2008, letter and also informed Pastor Peterson that had the Church not ceased engaging in religious assembly and religious worship on the property, he "would have contacted San Diego Gas & Electric and instructed them to cut all electrical power to the Church complex."

## B. Procedural History

### 1. Complaint

After the conversation between Pastor Peterson and Alazraki, the Church retained counsel and filed this suit. The Church did not attempt to obtain a Use Permit before doing so. Nor did it attempt to avail itself of the appeals process, as provided in the County's code, through which it could have obtained an official interpretation of the application of the zoning ordinance to its building.

The complaint alleged nine causes of action for statutory and constitutional violations under RLUIPA and 42 U.S.C. § 1983, including violation of: (1) RLUIPA's "substantial burden on religious exercise" prohibition, 42 U.S.C. § 2000cc(a); (2) RLUIPA's unequal terms prohibition, 42 U.S.C. § 2000cc(b)(1); (3) RLUIPA's total exclusion from jurisdiction or unreasonable limits on religious assemblies prohibition, 42 U.S.C. § 2000cc(b)(3); (4) right to free exercise under the First and Fourteenth Amendments, 42 U.S.C. § 1983; (5) right to free speech under the First and Fourteenth Amendments, 42 U.S.C. § 1983; (6) right to free assembly under the First and Fourteenth Amendments, 42 U.S.C. § 1983; (7) right to free association under the First and Fourteenth Amendments, 42 U.S.C. § 1983; (8) right to equal protection under the First and Fourteenth Amendments, 42 U.S.C. § 1983; and (9) right to procedural due process under the Fourteenth Amendment, 42 U.S.C. § 1983. The Church did not include an equitable estoppel claim in its complaint. The complaint sought all appropriate relief under RLUIPA, money damages, attorney's fees, a preliminary injunction allowing the Church to continue worshiping during the pendency of the action, a permanent injunction against the County's denial of the Church's constitutional and statutory rights, and a declaratory judgment elaborating the respective rights of the parties.

**Resumed Use and Inspection Request.** On August 6, 2008, the Church's counsel, Peter Lepiscopo ("Lepiscopo"), sent a letter to the County requesting that the County allow the Church to continue using the building during the suit. Thomas Bunton ("Bunton"), the County's attorney, telephoned Lepiscopo and told him that before the County could consider the request, the County would need to inspect the building to ensure that it was safe. Two days later, Lepiscopo sent the County a letter requesting that the County execute a stipulation regarding the inspection, including limitations on the scope of the inspection, the County's ability to use the results of the inspection in this legal action, and the County's right to take photographs or videos during the inspection, as well as a blanket right for the Church to terminate the inspection at any time for any reason.

Alazraki wrote to Lepiscopo on behalf of the County, urging that the Church should not hold services before the inspection because the inspection was for the purpose of ensuring that the building was safe. Alazraki explained that because the Church was operating without a Use Permit, it also had no valid certificate of occupancy for the building, and use of the building without a valid certificate of occupancy or Use Permit was "illegal." The Church nonetheless held religious services in the building on August 10, 2008.

The following day, Bunton sent an edited copy of the stipulation request. Lepiscopo did not agree to the changes, and stated that the Church would not allow the inspection to proceed on August 12. In response, Alazraki sent Lepiscopo an e-mail stating that the County Code allowed the County to inspect whenever it had reasonable cause to suspect that there was a violation of any law it enforces concerning the safety of structures on property. Accordingly, Alazraki stated that if the Church would not consent to an inspection, the County would seek and obtain a warrant. The next day—August 12, the scheduled date of inspection—the County obtained a superior court warrant to inspect the Church premises.

### 2. TRO Application and Inspection

Later that day, the Church asked the district court for a Temporary Restraining Order ("TRO") to enjoin the County from conducting the inspection. After a hearing on the request, the district court denied the TRO, but scheduled a hearing date to consider the Church's contemporaneous motion for a preliminary injunction.

The County finally inspected the building on August 14, 2008. The Church avers that three Sheriff's deputies, four County inspectors, a locksmith, and Alazraki participated. It also avers that Alazraki denied Lepiscopo's request that the Church's expert accompany the inspectors. Further, the Church avers that Alazraki told Lepiscopo that rectifying the code violations would require County permits, and "the County would not issue permits to allow repairs of the code violations unless and until the Church resolved the original land use issues" related to the Use Permit.

The County inspectors found numerous violations, including eight that were considered "serious." Alazraki informed the Church of these violations, and also stated that because of the life-threatening nature of some of the violations, "the Church to immediately cease holding assembly of any kind in the building."

### 3. Preliminary Injunction

The Church then moved for a preliminary injunction; it argued that it had suffered irreparable harm from the County's cease-and-desist order. This harm manifested in many ways: (1) the congregation was forced to hold its services in other places, including in members' homes, which was uncomfortable, curtailed the ability to worship with music, and cost the Church additional money; (2) many members could not attend the relocated services because of distance or inadequate facilities for children and the disabled; (3) the members suffered

psychological harms from the forced closing of the Church; (4) the Church incurred additional costs because of the drop-off in member contributions and the accumulation of graffiti on the recreation building in the Church's absence; and (5) the Church had to continue paying utilities and maintaining the grounds, despite its inability to occupy the building. The County did not oppose these factual assertions.

Although the complaint did not allege a claim for equitable estoppel, the district court order on the motion noted that the Church had argued in the course of the proceedings that principles of equitable estoppel should enjoin the County from arguing that a Use Permit was required. District Court Docket ("DCD") #34 at 5. The district court determined that the Church had a fair chance of success on the merits of that argument. *Id.* It also found that, at least on a motion for a preliminary injunction, the public interest favored the Church, especially since the County only alleged a generalized public interest rather than any specific, compelling government interest. *Id.* at 5-6.

However, the district court found that the Church's RLUIPA and constitutional claims under § 1983 were not ripe. It reasoned that because the Church had "never applied for either a MUP or a zoning change for the property . . . it [wa]s unknown whether Plaintiff will obtain such relief" until an application was filed. *Id.* at 6. The "failure to seek rezoning for the site or a MUP fails to establish a case or controversy as Plaintiff may very well obtain the relief it requests." *Id.* at 7.

As such, the district court granted in part and denied in part, the Church's preliminary injunction application. The court ordered the County to allow the Church to use the building for religious services, but only after the Church remedied the eight most serious code violations found by the County's inspectors and identified in the report sent to the Church by Alazraki. *Id.* at 7. The court also ordered the Church to submit

a Use Permit application so as to remedy the ripeness problems with its claims. *Id.* at 7. It denied the preliminary injunction request to the extent that the Church "[sought] to compel County to issue a MUP modifying the zoning for the site without Plaintiff first applying for and receiving a MUP to allow religious activities on the site. Plaintiff must complete all required applications to obtain a MUP, as required of all applicants seeking a MUP." *Id.* at 7-8.

### 4. Summary Judgment

The Church remedied the majority of the most serious violations, and, after an inspection, resumed use of the building for religious assembly on November 23, 2008. The Church began the Use Permit application process, and submitted a deposit of $14,597 for permit fees. Thereafter, the County sent the Church a "scoping letter," which set forth the additional fees, project issues, and public reviews that had to be completed before a Use Permit could issue. The letter required additional CEQA reviews and documentation, and stated that an additional $35,653 would be required to "get the project through to a hearing."[3] An expert retained by the Church estimated that the cost of complying with the CEQA environmental tests would be between $214,250 and $314,250, and the time-frame for complying would be approximately fourteen months to three years.

Rather than continuing with the Use Permit application process or requesting reconsideration of the fees and test requirements, the Church moved for partial summary judgment on its First, Fourth through Seventh, and Ninth causes of action, and moved to dismiss without prejudice its Second, Third, and Eighth causes of action.[4] It also moved for an award of attor-

---

[3]The Church maintains that the scoping letter demanded an *additional* $50,250 in fees, on top of the initial $14,597 deposit. This is incorrect, as the letter states that the $50,250 estimated total *includes* the initial deposit.

[4]As such, the Church abandoned its claims of violation of unequal treatment and total exclusion under RLUIPA, and its Fourteenth Amendment equal protection claim under § 1983.

ney's fees and costs, to have a jury separately determine the award of damages, and to permanently enjoin the County from enforcing the zoning ordinance through the Use Permit requirement. The Church contended that it could not afford to pay the retainer fees the County required as part of the Use Permit application process, and that therefore compelling its compliance would cause it to "cease to exist." Although the Church's own expert agreed that the application fees would be "exactly the same" regardless of the nature of the organization applying, the Church argued that it was entitled to summary judgment because the Use Permit application process itself constituted a substantial burden on the Church's practice of religion, in violation of RLUIPA and of the Church's constitutional rights.

The Church also argued that there was an existing Use Permit that allowed religious assembly, so the County could not enforce its regulation against the Church. In support of this argument, the Church submitted land use expert reports opining that (1) the 1971 and 1979 Use Permits approved use of the property for religious assembly because they stated "grant as per plot plan," and the plot plans included references to the building as an existing church; and (2) because the building was never converted into a bar and restaurant, the 1982 modification to the Use Permit never "vested." Additionally, the Church argued that, even if there was no existing Use Permit allowing religious assembly, the County should be estopped from enforcing the zoning regulation against the Church because it had led the Church to believe that religious use was allowed. The County filed a cross-motion for summary judgment on all claims, arguing that principles of equitable estoppel did not apply, there was no existing Use Permit allowing for religious assembly, and the Church's RLUIPA and § 1983 claims were not ripe.

On the Church's equitable estoppel claim, the district court reasoned that if there was an existing Use Permit or reliance on some representation by the County that religious use was

approved, the court's consideration of the RLUIPA and § 1983 claims could be rendered moot. DCD #76 at 8.

After reviewing the evidence submitted by the parties, the court found that, at most, there was a genuine issue of material fact as to whether any of the original permit grants would have allowed for religious assembly, and whether any of them could have survived the explicit expiration periods in the County's zoning ordinance that attended their grant, given the extended periods of disuse. The court emphasized that the undisputed testimony of Pastor Peterson, Rice, and Bragg established that the building had not been used for *any* purpose for many years. In concluding that the Church had not carried its burden of proof for establishing that a valid permit existed, the court noted that the Church had "fail[ed] to submit any authority permitting an expired MUP under [County zoning ordinance] Section 711 to be resurrected after the expiration date of the one year period." DCD # 76 at 10.

The district court held that "even if there is a hindsight argument that the County approved use of the Building for religious assembly in 1979," the Church had produced no evidence demonstrating that it or the owner of the property had ever relied on any prior approval of such a use. DCD # 76 at 10-11. The court further found that the Church failed to "submit any evidence that it incurred substantial work and expense in reliance on the existence of a MUP." Having determined that the Church did not reasonably rely on any facts omitted or misrepresented by the County, and that any reliance on the existence of a valid Use Permit was unreasonable, the district court "conclude[d] that equitable estoppel principles do not apply under the present circumstances."[5] DCD # 76 at 12.

---

[5]The district court does not explicitly note whether it dismissed the claim, or granted summary judgment to the County thereon. The order is titled "ORDER DISMISSING ACTION WITHOUT PREJUDICE FOR LACK OF SUBJECT MATTER JURISDICTION." Because it surveyed the facts produced by the parties, it appears that the court granted sum-

The district court then examined the Church's RLUIPA and § 1983 claims. It again held that because the Church had failed to complete the Use Permit application process, these claims were not ripe for review. In so concluding, the district court relied on the legislative history of RLUIPA, which showed that Congress did not intend for religious institutions to be exempted from "applying for variances, special permits or exceptions, hardship approval, or other relief" where they did not encounter discrimination or unfair delay. DCD # 76 at 13-14 (citing 146 Cong. Rec. S.7774-1, Joint Statement of Senators Hatch and Kennedy). It also relied on *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1035 (9th Cir. 2004), for the proposition that "RLUIPA does not eliminate the requirement that religious institutions [apply for] changes to zoning regulations." DCD # 76 at 13-14. The court reasoned that it was possible that if the Church completed the Use Permit application, the County would grant it and thereby moot the Church's claims. It concluded that any hardship suffered by the Church in the interim was caused by the "high costs associated with completing the required environmental studies, and not by any actions of County to hinder [the Church's] ability to obtain a MUP." DCD # 76 at 14.

The Church argued that the ripeness inquiry could be split into two time-frames: (1) the claims with respect to the Use Permit process and the conduct of the County in issuing the NOV to the Church, and (2) the conduct through the issuance of the court's preliminary injunction order. The former might be considered unripe, but the latter might be ripe because the Church could establish distinct harms for that period. The dis-

---

mary judgment to the County on the Church's equitable estoppel claim and the claim that a valid permit existed, while dismissing the remainder of the claims as unripe. It is also possible that the district court merely treated the equitable estoppel and existing permit arguments as threshold issues before reaching the ripeness issue presented by the Church's main claims. In either case, this court's review is *de novo*, *see* section II, *infra*, so we proceed to examine the merits of these claims under the same lens.

trict court rejected this argument, noting that "the underlying issue remains the same: whether or not, after compliance with applicable zoning and environmental regulations, the County issues Guatay the requested MUP." It found the "tone" of the NOV "unfortunate," but held that until the County determined whether it would issue the Use Permit, the Church's claims were all unripe. DCD # 76 at 15.

The court also noted that the Church had available to it an administrative remedy for "quickly and inexpensively" challenging the content of the scoping letter, and presumably the costs associated with it, but that the Church had chosen not to take advantage of that remedy. DCD # 76 at 15, n.7.

This timely appeal followed.

## II. STANDARDS OF REVIEW

We review de novo the district court's ruling on cross-motions for summary judgment. *Arakaki v. Haw.*, 314 F.3d 1091, 1094 (9th Cir. 2002). Ripeness is a question of law that is also reviewed de novo. *Carson Harbor Village Ltd. v. City of Carson*, 37 F.3d 468, 474 (9th Cir. 1994), *overruled on other grounds by WMX Techs. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).

## III. DISCUSSION

### A. Preliminary Issue: Existence of Valid Use Permit

[1] In its appellate briefs, the Church treats as a component of its RLUIPA and constitutional claims—rather than as a threshold issue or part of its equitable estoppel claim—the issue of whether a Use Permit allowing religious practice on the property existed. It appears the Church contends that the district court's ripeness determination was erroneous because the court also incorrectly determined that there was no valid Use Permit that allowed for religious use of the property,

arguing that the district court therefore erred in holding that the Church would have to apply for a Use Permit before any of its claims could ripen. Whatever the Church intended to argue on this matter, it is clear that any claim relating to the existence of a valid Use Permit allowing religious use on the property was not an element of, or in any way related to, the Church's RLUIPA or constitutional claims. A claim alleging that the County was wrongfully enforcing its zoning ordinance because the Church already possessed a valid Use Permit would be a matter of county or state law, the remedy for which should be sought through the County's administrative process or through state courts. RLUIPA and § 1983 provide remedies for violations of constitutional rights in the application of local zoning laws, not for violations of local zoning ordinances themselves.[6] The Church did not, as it claims, establish a *prima facie* showing that a RLUIPA or constitutional violation occurred simply by presenting some evidence to show that a valid permit might already exist.

However, if a valid Use Permit approving religious use of the building existed it could moot the Church's RLUIPA and constitutional claims. In the lower court, the Church proffered the testimony of various land use experts opining that the 1971 and 1979 Use Permits, which granted the permit modification applications "as per plot plan" where the plot plans included references to an existing church, validated the religious use of the property. Some of these experts opined that the 1982 Use Permit allowing for conversion of the recreation hall into a country western bar either expired or never vested because the building was never used for that purpose; therefore the prior Use Permits allegedly permitting religious use continued to apply throughout the Church's tenure on the property. The Church argues that because the County proffered no qualified land use expert refuting the Church's expert

---

[6]The Church makes no claim that the County was violating RLUIPA or the Church's constitutional rights by wrongfully revoking the Church's Use Permit in a religiously discriminatory manner.

testimony, the Church met its burden of proof for establishing a *prima facie* case for a RLUIPA violation, the County failed to meet its burden to refute the Church's showing, and the district court erred by granting summary judgment to the County.

The Church is mistaken, even if we were to construe it to have argued that its experts established a prima facie showing that a valid Use Permit existed. The district court was required to consider each cross-motion for summary judgment separately and to determine, viewing both motions, whether there was any genuine issue of material fact. *Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). But, contrary to the Church's contentions, the County did not have to submit any expert testimony in order to merit summary judgment in its favor because the applicable zoning laws and the granted permits *themselves* conclusively established that even if the 1971 or 1979 Use Permits had somehow allowed religious use of the property, these permits expired long before the Church began using the property for religious worship.[7] The versions of the applicable County zoning ordinance in force at the time of the 1971 and 1979 Use Permit approvals state in Section 711 that "[e]ach variance and permit heretofore or hereafter issued shall expire and become null and void at the expiration of one (1) year after the use for which it was issued shall have been discontinued."

The Church produced *no* evidence establishing that the building was actually used as a church during the period following the 1971 Use Permit's approval. In fact, prior owner Bragg stated there was no sign of a church when he bought the property in 1977, and any reference to an existing church on the 1979 permit modification application he submitted was an error because the building had been sold and was only used as a recreation hall and office. Further, the 1979 Use Permit itself expressly states that it would expire on February 2,

---

[7]We express no opinion as to whether these Use Permits did in fact approve use of the property for religious services.

1980, unless construction or use in reliance on that Use Permit commenced prior to that date. The parties both acknowledge that the building remained vacant and in disrepair for several years before the Church moved in. Indeed, the Church's own pastor testified that as far as he knew, the recreation building had not been used for *any* purpose for at least ten years prior to the Church's tenancy—long before the expiration date of the 1979 permit.

**[2]** Thus, the period of the property's disuse immediately preceding the Church's tenancy clearly exceeded the one-year expiration terms of both Section 711 and the 1979 Use Permit's explicit terms. As the district court noted, the Church failed to produce *any* evidence or law that would spare the 1971 or 1979 permits from the expiration provisions, even assuming those permits originally allowed religious use of the building.[8] On appeal, the Church points to nothing more than the expert testimony it proffered below. It thus still fails to argue that any authority or facts exist that would save the permits from expiration. Consequently, the district court did not err in granting summary judgment to the County as to the nonexistence of a valid Use Permit, because the Church's expert opinions failed to establish a genuine issue of material fact in light of the undisputed evidence and clearly applicable zoning ordinance.[9] *See* Fed. R. Civ. P. 56; *Matsushita Elec.*

---

[8]Indeed, the Church relied on an almost identical expiration provision in the 1982 Use Permit for the country western bar to argue that that permit was no longer valid, but made no effort to explain on appeal why only one of the three permits subject to such a provision—the only one not favoring its case—actually expired due to inaction.

[9]The Church argues that, because it requested a trial by jury, the district court violated the Seventh Amendment when it decided the issue of whether there was an existing Use Permit allowing the Church to conduct religious services on the property because the court was thereby resolving issues of disputed fact. This claim is meritless. The Church moved for summary judgment, and in doing so, asked the district court to determine whether there were any disputed issues of material fact. Summary judgment does not offend the Seventh Amendment right to a jury trial, so the

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " (citation omitted)).

## B.  Equitable Estoppel

**[3]** The Church argues that principles of equitable estoppel should spare it from completing the Use Permit application process. In order for this court to grant equitable estoppel, the Church must establish four elements: (1) the party to be estopped was " apprised of the facts"; (2) the party to be estopped intended that its conduct be acted upon, or acted such that the claimant "had a right to believe it was so intended"; (3) the claimant was "ignorant of the true state of facts"; and (4) "relied upon [the] conduct to his injury." *Green v. Travelers Indemnity Co.*, 185 Cal. App. 3d 544, 556 (Cal. Ct. App. 1986). If one of these elements is missing, we cannot grant estoppel. *Id.* A party seeking to estop the government must also show that it "incurs substantial expense in reasonable and good faith reliance on some government act or omission." *Toigo v. Town of Ross*, 70 Cal. App. 4th 309, 321 (Cal. Ct. App. 1998). Further, estoppel is used in the land use context only in " 'the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow.' " *Id.* (quoting *Smith v. County of Santa Barbara*, 7 Cal. App. 4th 770, 775 (Cal. Ct. App. 1992)). The Church has failed to meet this burden.

---

Church's only possible claim here is that the district court erred in determining that there was no genuine issue of material fact as to whether a Use Permit existed. *See Sengupta v. Morrison-Knudsen Co.*, 804 F.2d 1072, 1077 n.3 (9th Cir. 1986) ("The Constitution only requires that bona fide fact questions be submitted to a jury."). As we have already noted, the Church chose not to submit any evidence that the explicit terms of the permits do not apply here or that for some other reason the permits did not expire after having not been used for more than a year. Thus, the district court properly granted summary judgment to the County on this matter.

### 1. *Ignorance of True Facts*

**[4]** First, the Church cannot claim that it knew neither that to use the recreation hall for religious services generally required a Use Permit, nor that the Church in particular needed to apply for one. Rice testified that she proactively called to find out what was required to ensure the legality of the Church's use of the property immediately after the Church moved into the building in 1986. At that time, an unidentified County employee informed her that a Use Permit was necessary. Although Rice testified that an unidentified County worker later told her to take her paperwork back when she tried to submit the Use Permit application, her testimony makes clear that the worker did not explicitly state that the County's regulations did not require the Church to obtain a permit; he only told her that it was "too confusing out there" and not to worry about submitting a permit. Rice did not contend that she understood him to be actually applying or interpreting the pertinent law. At most, this statement could be construed to mean that the zoning regulation would not be enforced at that particular time. *See Golden Gate Water Ski Club v. Cnty. of Contra Costa*, 165 Cal. App. 4th 249, 258 (2008). Under California state law, however, parties cannot rely on lack of enforcement, even in the form of previous exemption grants, to establish entitlement to equitable estoppel. *See id.*; *City of Goleta v. Sup. Ct.*, 147 P.3d 1037, 1043 (Cal. 2006).

**[5]** Even if the employee's 1986 statement could have been taken to mean that a permit was not necessary, it is clear that by 1988, the Church, Pastor Peterson, Rice, and O'Flynn knew that a Use Permit was required in order to "legalize" the Church's use of the property. The County's statements in 1988 should have clarified any doubt that the Church might have had after Rice's encounter in 1986. Yet O'Flynn and the Church never filed a completed application, despite the fact that they had been apprised of the permit requirement multiple times.

## 2. *Reasonable Reliance*

**[6]** Additionally, as the district court noted, "[t]he record reveals, even if there is a hindsight argument that the County approved the use of the Building for religious assembly in 1979, that at no time did the current owner of the property nor Guatay rely upon the purported prior approval of the [Use Permit] to its detriment." DCD # 76 at 10. O'Flynn's and the Church's knowledge of the need for a Use Permit, multiple efforts to obtain one, and ignorance of the prior existence of any such permit undermine any claim that the Church actually relied on an existing valid permit while conducting religious services in the building.

Further, the Church could not have *reasonably* relied on any of the County's other actions—their granting the electrical permit to Doug's Electric, assessing the water system as adequate for a 200-person church, assessing taxes, or advising Rice not to turn in the permit application in 1986. First, the taxes assessed to the Church were for personal property and fixtures, not for the parcel itself. Second, the Church cites no California cases applying estoppel on account of assessed taxes, or imputing for estoppel purposes any tax collector's knowledge to another agency within the county government. Even if we were to consider this argument, which we decline to do,[10] the Church could not have made it successfully. The California Court of Appeal has rejected the theory that tax

---

[10]This court declines to address arguments presented as bare assertions not supported by legal argument that is set out "specifically and distinctly." *Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 487-88 (9th Cir. 2010); *see also Humble v. Boeing Co.*, 305 F.3d 1004, 1012 (9th Cir. 2002) ("Federal Rule of Appellate Procedure 28(a)(9)(A) requires that the appellant's argument contain her 'contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies,' " and, as such, the court deemed plaintiff's claims abandoned where she failed to outline the elements discrimination claims or explain how they related to her collective bargaining agreement. (citations omitted)).

payments provide the basis of equitable estoppel in land use disputes, absent some agreement between the government and the land user. *See Golden Gate Water Ski Club*, 165 Cal. App. 4th at 258-59 (finding that the assessment of taxes on illegal structures did not establish reliance meriting estoppel, where plaintiff "[did] not contend its payment was based on some understanding the structures thereby would be made legal or that their illegality rendered them immune from taxation").

Additionally, the Church provided no evidence showing that Pastor Peterson or any other member of the Church knew at any time prior to discovery that the County had granted an electrical permit to Doug's Electric for repairs on the property. Nor did the Church produce evidence showing any Church member was aware of the Department of Environmental Health Services letter finding the water supply adequate for a 200-person church.[11] Similarly, the Church produced no evidence nor argued that any member of the Church even knew about—let alone actually relied upon—any of the prior Use Permits when deciding whether to repair the building. Thus, the Church has shown no actual reliance on any actions by the County.

The Church cites to *Congregation Etz Chaim v. City of Los Angeles*, 371 F.3d 1122 (9th Cir. 2004), to support its reliance argument. This citation is inapposite. *Congregation Etz Chaim* treated a distinct scenario in which the City of Los Angeles granted the congregation's application for a building and grading permit after a long history of litigation, renovation and settlement negotiations, and voluntary plan concessions on the part of the congregation to comply with the city's

---

[11]Furthermore, since this letter did not purport to grant a Use Permit to O'Flynn, and the Church proffered no authority demonstrating that any department within the County system other than the Department of Planning and Land Use could legally act to grant a Use Permit, we see no reason why any entity could reasonably rely on this letter as proof that the County had approved O'Flynn's desired change to property use.

demands. *Id.* at 1123-24. We determined that the congregation was entitled to equitably estop the city from revoking the granted building permit given the history of the parties, the city's express approval of the permit, and the congregation's incursion of substantial financial liabilities in direct reliance on the permit. *Id.* at 1124-25. We rejected the city's argument that the permit had been granted in violation of sizing regulations because the proposed size of the building was "clearly delineated in the building plans that were reviewed at length and approved by the City." *Id.* at 1125. The city could not "dispute that it had ample opportunity to review both the plans and the Agreement before granting the permit." *Id.* Thus, the city's permit grant, after complete disclosure by the congregation, induced reasonable reliance by the congregation, which is why we applied equitable estoppel. *Id.* Here, the Church has alleged no County actions even approaching the level of governmental inducement in *Congregation Etz Chaim*, let alone any reasonable reliance on such governmental behavior as in that case.

Even the county employee's statement to Rice to take back her paperwork because it was "too confusing out there" and "not to worry about it" could not establish reasonable reliance. California courts have refused to apply estoppel where county employees purportedly told land owners on *multiple* occasions that permits were not required to run a bed and breakfast on their land; their reliance on these statements was unreasonable because the County had also informed the landowners that the operation of their inn violated its zoning laws. *See County of Sonoma v. Rex*, 231 Cal. App. 3d 1289, 1297 (1991); *see also City of Goleta*, 147 P.3d at 1043 (declining to find reasonable reliance where city previously exempted project from regulations). Similarly here, since the County informed the Church and O'Flynn in 1988 that a Use Permit was required to "legalize" the Church's use of the building, it is clear that any continued reliance on the 1986 statement was unreasonable.

Lastly, the Church's purported reliance on the County's lack of enforcement for the period that the Church inhabited the recreation hall is not reasonable reliance meriting the exercise of equity here. *Golden Gate Water Ski Club*, 165 Cal. App. 4th at 254-59, determined that Contra Costa County's failure to enforce its similar permit requirement against a water ski club and residential settlement for thirty-three years did not require the application of equitable estoppel—even though a county employee had stated early on that the county would not "hassle" the club over the land use regulation violations—because, as here, the county had never expressly stated that the use was permitted. *Id*. The court held that:

> [a]t the most, the County's inaction for several years, together with the representation of a single employee in 1974, might have led the Club to believe the amount of development existing in the early 1970's would be tolerated, at least during the administration in place at that time. Nothing in the employee's representation or the County's inaction reasonably could lead the Club to believe the County never would enforce its land use requirements.

*Id.* at 258. The court concluded that the county's inactions were simply not a reasonable basis upon which the club should have relied before erecting additional structures on the land; the improvements to the land therefore were no basis for estoppel and the court concluded that the club had suffered no actual injuries that could be imputed to the county. Likewise here, the Church could not have reasonably relied on the County's lapsed enforcement of the zoning regulations when it decided to make improvements to the building, especially after the County had expressly stated to the Church that it needed a Use Permit to operate a church legally on the premises. As in *Golden Gate Water Ski Club*, any damages that the Church sustained relying upon the County's delayed decision to enforce the regulations—including the expense of submitting the Use Permit application more than twenty years after

it knew it was required to do so—must be attributed to the Church's unreasonable belief that the regulation might never be enforced. *Id.* Simply put, reliance on non-enforcement until "compelled to desist . . . is not an injury allowing the defense of equitable estoppel." *Id.* at 259.[12]

**[7]** Because it is clear the Church cannot establish at least two of the four elements of equitable estoppel, we must affirm the district court's grant of summary judgment to defendants on this issue. *Green*, 185 Cal. App. 3d at 556.

## C.   Ripeness

We agree with the district court's decision to apply the *Williamson County* final decision requirement here and approve the dismissal of the Church's RLUIPA claims as unripe for lack of a final decision: that reasoning encapsulates well why the Church's RLUIPA claims are unreviewable by this court at this time.[13] We cannot determine if the Church has suffered a "substantial burden" under RLUIPA until at least one Use Permit application has been submitted.[14] The Church's

---

[12]Contrary to the Church's contention, an earlier California Supreme Court decision, *Long Beach v. Mansell*, 3 Cal. 3d 462 (1970), does not render *Golden Gate Water Ski Club* inapplicable here. In *Mansell*, the city had never protested the use of the lands at issue over the course of almost seventy years, and thousands of residents would have been affected by the city's land use action. *Id.* at 472. The court found that the city's complete and total inaction, coupled with the vast number of affected residents, amounted to the extraordinary circumstances meriting equitable estoppel. *Id.* at 499. Such extreme circumstances are not presented here. *See also Golden Gate Water Ski Club*, 165 Cal. App. 4th at 259-63 (distinguishing *Mansell* from other zoning cases as involving "extraordinary circumstances").

[13]We do not find occasion today to extend the final decision ripeness requirement to the Church's RLUIPA-related § 1983 claims because they have not been sufficiently argued.

[14]RLUIPA provides that a government land-use regulation "that imposes a substantial burden on the religious exercise of a . . . religious

remaining arguments asserting the ripeness of its other claims are unavailing, and because the Church did not sufficiently plead, its remaining § 1983 claims do not merit our review.

### 1. *The* Williamson County *Final Decision Requirement and Its Application to RLUIPA Claims*

[8] In the landmark takings case *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), the Supreme Court held that "[a] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." 473 U.S. at 186. The property owners in that case had not yet submitted their plan for development, nor had they filed even a single application for a variance, and therefore, the Court held, their takings claim was not ripe because there was no "final decision" regarding the permitted use of the property to which it could look in making its deci-

---

assembly or institution" is unlawful "unless the government demonstrates that imposition of the burden . . . is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1). These provisions apply in any case in which "the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2)(C).

This section provides for broad protection of the rights of religious organizations, and encompasses a wider scope of conduct in defining "religious exercise" than traditional constitutional free exercise jurisprudence. *See Rocky Mountain Christian Church v. Bd. of Cnty. Comm'rs of Boulder Cnty.*, 481 F. Supp. 2d 1213, 1223-24 (D. Colo. 2007). The Church bears the burden of proving that the County's application of its zoning ordinance resulted in a substantial burden on its exercise of religion. *San Jose Christian College*, 360 F.3d at 1034.

sion. *Id*. at 187-91.[15] This court later applied the *Williamson County* final decision requirement to takings claims as well. *Hoehne v. County of San Benito*, 870 F.2d 529, 532 (9th Cir. 1989) (citing *Williamson County*, 473 U.S. at 186).

**[9]** Many of our sister circuits, as well as district courts within our own circuit, have applied the *Williamson County* final decision requirement to RLUIPA claims. Facing a factual scenario very similar to our own, and relying on this court's statement in *Hoehne*, the Second Circuit examined at length the application of *Williamson County* to the RLUIPA and First Amendment contexts. *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342 (2d Cir. 2005). The Murphys owned a single-family home in an area zoned for single-family residential use. There they conducted large weekly prayer meetings. *Id*. at 345. After an investigation into the matter prompted by complaints from the Murphys' neighbors, the local zoning commission concluded that the prayer meetings were not permitted uses for buildings zoned as single-family homes and sent a letter to the Murphys informing them that meetings as large as theirs violated the zoning regulations. *Id.* The Murphys immediately filed suit. *Id.* The commission then issued a formal cease-and-desist order, although it did not have the power to issue any fines or convictions. *Id.* at 345, 351. Rather than attempting to obtain a variance by appealing the cease-and-desist order, the Murphys amended their federal complaint to include First Amendment and RLUIPA claims. *Id*. at 345.

---

[15]In addition to the final decision requirement, the Court in *Williamson County* articulated a second requirement governing the ripeness of a takings claim: exhaustion of the state remedial process. The Court reasoned that the process might yield the property owner just compensation, thereby mooting his takings claim against the government. 473 U.S. at 194-95. The Court acknowledged that the two ripeness requirements—final decision and exhaustion—"often overlap" but are nonetheless distinct. *Id.* at 193. Today we extend only the final decision requirement to RLUIPA claims; the exhaustion requirement in *Williamson County* was specific to the takings context.

On appeal, the Second Circuit applied *Williamson County* to the Murphys' First Amendment and RLUIPA claims, holding these claims unripe because the Murphys had failed to appeal the cease-and-desist order and apply for a variance. *Id.* at 347-53. The court noted that in land use contexts the *Williamson County* final decision requirement serves the essential goal of ripeness jurisprudence: it helps federal courts avoid entanglement in abstract disputes which would be better defined and more easily resolved with a more complete and concrete factual record. It noted that four considerations undergirded its decision to apply this component of *Williamson County* to the RLUIPA context. Specifically, the final decision requirement: (1) aids in developing a full record; (2) is the sole means by which a court can know precisely how the regulation at issue would finally be applied to the property; (3) might provide the relief the landowner seeks without requiring the courts to engage in unnecessary constitutional analysis; and (4) accords with principles of federalism because, by encouraging resolution of land use disputes at the local level, it "evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern." *Williamson County*, 473 U.S. at 348-49 (citations omitted). The court reasoned however that the requirement would not apply where an appeal to the zoning board would be "futile"—such as where the government was behaving obstinately, where the board lacked discretion to grant any variance, or where the zoning entity's actions would be purely remedial, such as where it had no power to engage in any decisionmaking. *Id.*

The Second Circuit also noted that other circuits had also extended this requirement to constitutional claims. *Id.* at 350. The court concluded that because "Congress endeavored to codify existing Free Exercise jurisprudence" when it enacted RLUIPA, it did "not believe it necessary to distinguish the RLUIPA claim from the First Amendment Free Exercise claim when it [came] to [its] ripeness inquiry." *Id.* at 351 (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1239 (11th Cir. 2004), and *Westchester Day School v.*

*Vill. of Mamaroneck*, 386 F.3d 183, 191 (2d Cir. 2004)). The *Murphy* court acknowledged, however, that because the ripeness doctrine was "somewhat relaxed" in the First Amendment context, the final decision requirement should be "cautiously applied." *Id.* (citations omitted). Accordingly, it added a preliminary inquiry to its determination of whether the Murphys would be required to show that a final decision had been reached: (1) whether the Murphys experienced any immediate injury as a result of the government's actions, and (2) whether requiring them to pursue additional remedies would further define their alleged injuries. *Id.*

Answering these threshold questions, the court first concluded that the Murphys had not alleged a colorable claim of immediate injury because the commission that had issued the cease-and-desist order had no power to fine or prosecute them. Rather, the commission would have had to enforce the action in state court, and that court would have had to determine whether any penalties would be necessary to deter future violations. *Id.* Additionally, because enforcement would have been stayed pending the determination of any enforcement action, the Murphys were incorrect that their "only recourse following the cease and desist order was to suspend their prayer meetings, rendering their injury immediate." *Id.*

Second, the court determined that the alleged injury was ill-defined in the record. For example, the record did not reveal whether the zoning commission had enforced its regulations in a discriminatory manner, nor could the parties agree on what the challenged issue was in the case, nor even on who the proper defendants were in the case. *Id.* Had the Murphys pursued the recourse available to them at the local level, however, they might have fixed these infirmities; the zoning board of appeals, mandated by Connecticut law, was well-equipped to address and clarify "murky" issues such as these. *Id.* Had the Murphys appealed the cease-and-desist order and requested a variance from this board, they would not only have been able to develop the factual record better—

determining more precisely the contours of their alleged injury—but may also have received the relief they sought, thereby sparing the court from premature entanglement in these issues. The Second Circuit therefore found the Murphys' RLUIPA and First Amendment claims unripe because of the Murphys' failure to seek a variance or—in the language of *Williamson County*—for their failure to present the court with a final decision from the local land use authority.[16] *Id.* at 352-53.

**[10]** All of the circuits to address this issue have applied the final decision requirement to RLUIPA claims, as well as to related First Amendment-based § 1983 claims when they were presented, reasoning that the requirement of a final decision—either on a variance application, a special use permit application, or through a single appeal of a denied permit—served the purposes of the ripeness doctrine, as outlined by *Murphy. See, e.g.*, *Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 537 (6th Cir. 2010); *Grace Cmty. Church v. Lenox Township*, 544 F.3d 609, 616 (6th Cir. 2008); *Congregation Anshei Roosevelt v. Planning & Zoning Bd. of the Borough of Roosevelt*, 338 Fed. Appx. 214, at *9-15 (3d Cir. July 22, 2009) (unpublished).

This circuit's district courts have likewise required finality (but not exhaustion of administrative remedies) under *Williamson County* before finding RLUIPA claims ripe. *See, e.g.*, *Hale oKaula Church v. Maui Planning Comm'n*, 2003 U.S. Dist. LEXIS 24509, at *7 (D. Haw. March 24, 2003); *Oblates of St. Joseph v. Nichols*, 2002 U.S. Dist. LEXIS 27672, at *19 (E.D. Cal. April 24, 2002). Other circuits' district courts apply the requirement as well. *Roman Catholic Bishop of Springfield v. City of Springfield*, 2011 U.S. Dist. LEXIS 345, at *21

---

[16]It should be noted that the *Murphy* court did not extend the second prong of the *Williamson County* ripeness test—the exhaustion of the state remedial process—from the takings context to the RLUIPA context. *Murphy*, 402 F.3d at 349. Nor do we apply that requirement here today.

(D. Mass. Jan. 4, 2011); *Shenkel United Church of Christ v. North Coventry Twp.*, 2009 U.S. Dist. LEXIS 106314, *20-26 (E.D. Pa. Nov. 13, 2009); *cf. Rocky Mountain Christian Church*, 481 F. Supp. 2d at 1223-24 (treating RLUIPA and First Amendment claims as ripe where the county had already denied the permit application and no further factual development would help the court).

Additionally, although this court has not yet applied the *Williamson County* final decision ripeness requirement to the RLUIPA and related First Amendment contexts, it has held that the final decision requirement is applicable to other constitutional claims, including those brought under substantive due process and equal protection theories, *Hoehne*, 870 F.2d at 532, and in certain instances to procedural due process claims arising out of the application of land use regulations as well. *Del Monte Dunes at Monterey, Ltd. v. City of Monterey* 920 F.2d 1496, 1506 (9th Cir. 1990).

### 2. *Application of the Final Decision Requirement Here*

As in *Murphy*, requiring the Church to submit a full application for a Use Permit before we can find its RLUIPA claims ripe serves important purposes of the ripeness doctrine. This will enable us to refer to a full record and to understand precisely how the Church is in fact allowed to use the building before we engage in constitutional analysis. By requiring the Church to seek recourse at the local level, this approach may provide the Church with relief without expending further court resources and it will enable us to respect principles of federalism which counsel in favor of resolving land use disputes locally.

Like the *Murphy* claimants, the Church here has not alleged a colorable argument of immediate injury: it did not need to vacate the premises upon receipt of the County's communications, and it is currently enjoying use of the building for the pendency of this suit; requiring one complete application from

the Church before we can regard its claims as ripe will enable us to have a fuller record upon which to conduct a RLUIPA analysis.

Moreover, the exceptions built into the *Murphy* analysis do not apply here: the County has the power to grant the permit that the Church needs, it has the power to engage in decision-making, and there is no evidence that the Church's application would in any other respect be "futile"—though we address the Church's arguments to the contrary below. As such, the Church's RLUIPA claims are unripe because it has not submitted a single complete Use Permit application.

As we have explained before, "Ripeness 'is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.' " *McClung v. City of Sumner*, 548 F.3d 1219, 1224 (9th Cir. 2008) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)). As such, Article III ripeness, which is a matter of constitutional law, is jurisdictional, while " '[p]rudential considerations of ripeness are discretionary. . . .' " *Id.* (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1142 (9th Cir. 2000) (en banc)); *see also Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121-1122 (9th Cir. 2010) ("The Article III case or controversy requirement limits federal courts' subject matter jurisdiction by requiring, inter alia, that plaintiffs have standing and that claims be 'ripe' for adjudication.").

The Supreme Court has treated the final decision requirement outlined in *Williamson County* as a matter of prudential ripeness. *See Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 734 (1997). Nonetheless, our circuit continues to treat ripeness in land use contexts—most pointedly in takings cases—as a matter of both Article III and prudential concern. *McClung*, 548 F.3d at 1224 (collecting cases).

**[11]** Because we today apply the final decision ripeness requirement outlined in *Williamson County* to the Church's RLUIPA claims, determining them to be premature for lack of a final decision by the County, we need not decide whether the Church's claims are unripe as a matter of prudence or of constitutional law. In either case, the Church's failure to complete even *one* full Use Permit application leaves us unable to discern whether there is a true case or controversy, and any resulting injury.[17] Ultimately the County may grant the Church a Use Permit upon the Church's compliance with the state and county requirements, effectively mooting the claims upon which the Church now seeks relief from this court.

a.  *"Cease-and-Desist Orders" as a "Final Decision"*

The Church contends that, unlike in *Williamson County*, its claims here are not premature and it need not submit a complete Use Permit application for its claims to ripen because the County's "cease and desist orders"[18] were themselves the

---

[17]For this reason, we reject the Church's contention that the district court erred because it dismissed the Church's claims for lack of subject matter jurisdiction. The district court's only reference to subject matter jurisdiction appeared in the caption to its order dismissing the Church's claims as unripe. DCD # 76 at 1. The County does not contest that the district court had subject matter jurisdiction to entertain the Church's claims in the first instance in order to determine whether the matter was ripe to proceed to trial. The entirety of the district court's analysis, other than its initial consideration and rejection of the state law equitable estoppel claim, revolved around ripeness. That is the sole reason it cited for dismissing the case without prejudice. DCD # 76 at 15-16. At most, this amounted to imprecise captioning reflecting the fact that this circuit sometimes treats ripeness as a prudential matter and sometimes treats it as one of Article III constitutional concern, depending on how clearly the dispute and harms are defined. *Cf. McClung*, 548 F.3d at 1224 (collecting cases). As such, there was no error based on the district court's characterization of its order dismissing the Church's claims.

[18]The Church's brief refers to multiple cease-and-desist orders. However it is clear from the record that the Church actually refers to a Notice of Violation dated April 2008 and one letter dated May 2008 which might be construed to be a cease-and-desist order.

County's final decision for *Williamson County* purposes. This argument evinces a misunderstanding of the final decision requirement and it fails. A "final decision" as contemplated by *Williamson County* does not refer to a decision about whether the Church is *currently* violating land use regulations —as contained in the County's communications to the Church in April and May 2008. Rather, the final decision we need to proceed on the merits of these claims is one regarding whether the Church will or will not be granted a permit to use the property as it wishes moving forward—which can only result from a completed Use Permit application. In other words, we cannot even begin to determine that the County has definitively barred the Church from using the building as it wishes until it has had the opportunity to evaluate a completed application and has determined how it will apply its land use regulations to the Church. This conclusion comports with ripeness jurisprudence generally speaking, as well as with the "general rule, [that] in the land use context, constitutional challenges are ripe only when the administrative body issues its 'final definitive position regarding how it will apply the regulations at issue to the particular land in question.' " *See Oblates of St. Joseph*, 2002 U.S. Dist. LEXIS 27671, at *12 (citing *Herrington v. Cnty. of Sonoma*, 857 F.2d 567, 568-69 (9th Cir. 1988) (quotations omitted)).

b. *Futility*

The Church further argues that, even if the *Williamson County* final decision requirement applies to its RLUIPA claims, the Church's claims are ripe because they fall within that requirement's exception: claimants need not further pursue a final decision where to do so would be "futile." The Church argues that the financial burden it must undertake to complete the application process would necessarily "destroy" the Church, rendering the process in that sense "futile."

However, the Church does not use the word "futility" in the sense meant under *Williamson County* and its progeny in

other land use contexts. Under the final decision requirement, "futility" refers to conditions that make the process itself impossible or highly unlikely to yield governmental approval of the land use that claimants seek—such as government obstinacy or where the only governmental body to which claimants can appeal is unable to authorize claimants' desired land use. *See, e.g.*, *Hoehne*, 870 F.2d at 535 (holding that it would have been futile for a couple to submit additional applications because no variance was available for their needs, and the county authorities had made clear that they would not approve of the couple's desired use of the land because they had already re-zoned it); *cf. Guru Nanak Sikh Soc'y v. Cnty. of Sutter*, 456 F.3d 978, 989-90 (9th Cir. 2006) (holding that no additional applications were necessary where there were no zones providing for religious use as of right, county repeatedly denied temple's application for conditional use permits despite temple's efforts to comply with County's requested plan modifications and denial reasons, and reasoning of county's previous denial made the success of any future permit application highly unlikely). The Church has presented no evidence that the County will not or cannot issue a Use Permit once it has received a complete application, and once the Church has complied with what is required of all applicants. Although the Church's alleged financial straits are lamentable, this is no fault of the County's and is no reason for us to except the Church from the obligations of all Use Permit applicants. Finally, even if the Church had made a sufficient "futility" argument, Ninth Circuit jurisprudence in this area still does not excuse permit-seekers who fall into this exception from the final decision requirement from submitting at least one complete permit application. *Herrington*, 857 F.2d at 569 ("A property owner cannot rely on the futility exception until he or she makes at least one meaningful application.") (citations omitted).

### 3. *Use Permit Application Process Itself as Substantial Burden*

It seems that the Church offers an alternate ripeness theory, *Williamson County* notwithstanding, arguing that the costs of

complying with the scoping letter are themselves a "substantial burden" under RLUIPA. The Church characterizes the costs of compliance with the scoping letter as "unreasonable and unattainable" for a non-profit organization in its position, and implies that the County has deliberately imposed these requirements to quash the Church's religious exercise. Our application of *Williamson County* today does not foreclose an argument that financial obligations alone might constitute a substantial burden for the purposes of RLUIPA, but neither do we address that question today. Even if we were to determine that such an argument could be made, the record here is insufficient for us to reach the merits of this "cost-as-burden" claim.

Where, as here, a religious institution is required to comply with a facially neutral and generally applicable zoning scheme, this court must "examine the particular burden imposed by the implementation of the relevant zoning code on the claimant's religious exercise and determine, on the facts of each case, whether that burden is 'substantial' " for the purposes of RLUIPA. *Int'l Church of Foursquare Gospel v. City of San Leandro*, 2011 WL 1518980 at *6 (9th Cir. 2011, April 22, 2011) (citing *Guru Nanak*, 456 F.3d at 987). The claimant bears the burden of proof. *Id*.

Here, however, the record contains no finalized account of the "particular burden" that the Church must shoulder—what the Church will actually have to pay or do to comply with the County's process and secure a permit. As mentioned above, the district court observed that the Church had the option to "quickly and inexpensively" have senior County officials review the scoping letter through the County's Project Issue Resolution process. Mentioned in the scoping letter itself, the issue resolution process would have enabled County officials to consider "disagreements with staff interpretations of codes or ordinances, requests for additional information or studies, or disagreements regarding project related processing requirements." Had the Church pursued these remedies, we might

have known its definitive, particularized obligations, but it has not done so. All that the record shows regarding the Church's projected costs of compliance with the scoping letter is the widely varying estimates of its expert ($214,250-$314,250). Even if these numbers were both accurate and more precise, they would not tell us the Church's definitive obligations if the Church had not first availed itself of the available administrative remedies. Thus, we cannot determine whether this permit application process itself constitutes a substantial burden on the Church, and we need not pass judgment on the broader question of whether costs of some magnitude alone can ever constitute a substantial burden for the purposes of RLUIPA claims.[19]

**[12]** Given that the Church's claims—that it has already suffered a "substantial burden" under RLUIPA or that it will in the future by submitting a Use Permit application—are unripe, the County was not required to justify its enforcement mechanism by showing that it served a compelling interest or was the least restrictive means of doing so, contrary to the Church's averment. *See* 42 U.S.C. § 2000cc (requiring showing of compelling interest and least restrictive means only where there is a showing of a substantial burden); *San Jose Christian College*, 360 F.3d at 1030-34 (neutral law of general application need only survive rational basis review on free exercise challenge where burden is indirect, and content-neutral zoning ordinances are treated as time, place and manner restrictions requiring only substantial government interest, unless shown to be pretextual, in the context of free speech challenges).

---

[19]Similarly, we do not today hold that simply because a zoning regulation is neutral and generally applicable it is by definition incapable of imposing a substantial burden on religious exercise. Indeed, this court recently restated its long-held conclusion that there is no such tautology. *Int'l Church of the Foursquare Gospel*, 2011 WL 1518980 at *6. However, it is worth noting that the Church's expert testified that his estimate for the costs of the Church's compliance with the scoping letter would be the same for any organization applying for a MUP for this property.

### 4. Remaining Claims under § 1983

Before turning to the Church's individual § 1983 claims, we address the Church's argument that the district court erroneously held that its § 1983 claims were not ripe because it failed to exhaust administrative remedies. We need not address the merits of this argument, as the district court did not so hold. As discussed above, the district court did observe that the Church had other administrative remedies available to it to challenge the contents of the scoping letter. Nonetheless, the district court's ripeness determination was *not* predicated on the Church taking advantage of this opportunity, DCD #76 at 15-16 & n.7, so there could be no attendant error. Rather, it held that the Church's § 1983 claims were not ripe for the same reasons its RLUIPA claims were not ripe: the Church failed to complete the application process for a Use Permit, which would have provided a final decision as to the Church's ability to use the property as it wished, and therefore allowed the court to review any constitutional violations. *See id.*

### a. *Procedural Due Process*

The Church alleges that the County has already violated its procedural due process rights in violation of § 1983 by sending the April 2008 NOV and the May 2008 cease-and-desist order,[20] and that the district court therefore erred in dismissing its procedural due process claims as unripe.

[13] To obtain relief on § 1983 claims based upon procedural due process, the plaintiff must establish the existence of "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and]

---

[20]The Church's brief refers to multiple cease and desist orders from April and May 2008, although only one was ever sent. Because the only April 2008 communication between the parties that might fit this description was the NOV, we assume the Church means to challenge the issuance of the NOV as a violation of its procedural due process rights.

(3) lack of process." *Portman v. Cty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). This court has held that procedural due process claims may in certain land use contexts be ripe even where the underlying substantive claims remain unripe due to the absence of a final decision regarding land use. *Harris v. Cty. of Riverside*, 904 F.2d 497, 501 (9th Cir. 1990). However, such procedural due process claims ripen only when it is clear that a distinct deprivation of a constitutionally protected interest in liberty or property has already occurred, thereby warranting a federal court's consideration of the question of whether the deprived party received the process to which it was due.

It is not entirely clear from its brief if the Church's procedural due process claims are based on the alleged deprivation of a property interest or on the deprivation of a liberty interest, or both, but in any event it has not made a sufficient threshold showing that there has been a deprivation of any kind. *See, e.g.*, *Newman v. Sathyavaglswaran*, 287 F.3d 786, 789 (9th Circ. 2002) (stating that without the initial showing that a deprivation has occurred, no procedural due process analysis can proceed).

**[14]** The Church presents no legal argument here to demonstrate that such a deprivation has already occurred, nor do the facts speak for themselves on this matter. In this case, although strongly worded, the County's NOV and cease-and-desist order did not themselves deprive the Church of any interests. The County would have had to bring an enforcement action in court in order to actually enforce the zoning regulations—and it in fact notified the Church of that in its May 2008 letter. Without bringing the Church to court, the County had no power to, for example, padlock the building doors or make arrests, nor did it take any such action. Had the County brought the Church to court, the Church would have received notice, an opportunity to be heard, and an opportunity to present evidence; at the very least, we would have a record upon which to make a judgment about whether the

Church had received sufficient process. Instead, the Church chose to vacate the property and bring the County to court. And the Church has continued to hold its services for the entirety of this process: it initially held services elsewhere (albeit at some inconvenience) and since November 2008 it has enjoyed the use of its previous building during the pendency of this suit. While the fraught relations between the County and the Church are lamentable, the Church's reaction to the County's communications in the spring of 2008 does not amount to the County's depriving the Church of a liberty interest recognizable under Due Process Clause jurisprudence. Without such a deprivation, procedural due process claims are moot. *See, e.g.*, *Zinermon v. Burch*, 494 U.S. 113, 126 (1990) ("The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process.").[21]

Moreover, the Church has not made a legal argument demonstrating that it even had a constitutionally protected property interest, of which it might have conceivably been deprived, in the use of the building without a valid Use Permit and in violation of land use regulations. Protected property interests are not created by the Constitution, but by "existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those bene-

---

[21]Notably, the Church did not include in the argument section of its briefs any contention that the County's revocation of the certificate of occupancy for the building (following discovery of the code violations upon inspection) was *itself* a violation of procedural due process. Instead, the Church made a vague reference to due process concerns related to the *cease-and-desist orders* in the portion of the *fact* section of its brief discussing the certificate of revocation, without ever contending that the revocation was without the proper procedural due process. We refuse to consider arguments made only in passing, and refuse to assemble an argument for appellant from various statements made throughout its brief. To merit our consideration legal theories must be argued "specifically and distinctly." *Christian Legal Soc'y*, 626 F.3d at 487-88.

fits." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577(1972)). Here, the Church has provided no California law or precedent establishing that it had a vested property right in using the building for religious services where it never obtained a permit for doing so and the applicable zoning ordinance never permitted use of the property for religious services at any point during the Church's tenancy. The Church admits that it never obtained a valid Use Permit and it has not argued that it had a property interest in the Use Permit process itself. *Cf. Parks v. Watson,* 716 F.2d 646, 656-57 (9th Cir. 1983) (discussing how particular procedures can amount to "entitlements" protected by due process). Additionally, as discussed above, the Church did not reasonably rely on any actions of the County when it settled into the recreation hall, made repairs, or invested in the property, so it could not have argued that it had a vested property interest in the expectation of using the property for religious assembly.[22] *Cf. Harris*, 904

---

[22]Even were we to consider an argument that revocation of the certificate of occupancy was in violation of the Church's federal or state procedural due process rights, the Church has failed to explain why the revocation, authorized by the state and county building codes in order to preserve the health and safety of the occupants and compliance with the law, *see* Cal. Code Regs., tit.24, part 2, § 111.4 (2010) (previously Cal. Code Regs. tit. 24, § 109.6); San Diego County Code of Regulatory Ordinances § 91.1.111.4, would not have been adequately addressed in post-deprivation appeals procedures available in both the state and County codes, *see* Cal. Code. Regs., tit.24, part 2, § 113.1 (previously Cal. Code Regs., tit. 24, § 105.1); San Diego County Code of Regulatory Ordinances § 91.1.113.1. It appears that the Church's belief that there were no real safety hazards and that revocation was wrongful would have been appropriately considered through the County's available appeals process, of which the Church chose not to avail itself. The Church also omits any argument as to why its failure to use the available appeals processes does not bar its procedural due process claim. *See Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 300 (1981)("[D]eprivation of property to protect the public health and safety is '[one] of the oldest examples' of permissible summary action" for which pre-deprivation procedures are not required. (citation omitted)); *Raditch v. United States*, 929 F.2d 478, 482 (9th Cir. 1991). We decline to reach arguments so vastly undelineated on appeal.

F.2d at 503 (quoting *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 121(1928) (stating that property use expectations can rise to the level of protected property interests)).

The Church merely references its lease of the Park's recreation building over the years, its use of the building, and its investments in and improvements on the property. Then, citing *Memphis Light, Gas, and Water Division v. Craft*, 436 U.S. 1(1978), the Church asserts that these factors taken together created the "significant property interest" for which a pre-deprivation hearing is required. This ignores the analysis undertaken in *Craft*. The Court in that case explained that the underlying substantive interest of a due process claim is created by state law and that only once that interest is determined can a federal court proceed with constitutional analysis to ascertain whether that underlying substantive interest "rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause.'" *Id.* at 9 (citing *Roth*, 408 U.S. at 577 (1972); *Perry v. Sindermann*, 408 U.S. 593, 602 (1972)). In *Craft,* the Court had sufficient basis in Tennessee decisional law to determine that an underlying substantive interest existed in the first place; we have no such argument to draw upon here to allow us to determine that a "substantive" property interest exists, much less to engage in the constitutional analysis of determining whether such a property interest warrants the protection of the Due Process Clause. *Craft* does not define what constitutes a significant property interest, and certainly does not address whether the mere illegal use and improvement of a leased building—without the required Use Permit or even building permits for the improvements—can establish the requisite property interest for a procedural due process claim.

**[15]** In the absence of the Church presenting a viable argument regarding what property interests are at stake, the County is entitled to summary judgment on the Church's pro-

cedural due process claim. *See, e.g.*, *Wood v. United States*, 2006 WL 2829829 at *8 (E.D. Cal. 2006).

Although the Church may also have premised its procedural due process claims on deprivations of liberty interests, this is not entirely clear. In laundry-list form, the Church asserts that the County had deprived it of "federally protected constitutional rights (i.e., free exercise of religion, free speech, free assembly, and free association)." In its procedural due process argument, the Church says nothing beyond this to characterize the liberty interests of which it asserts it has been deprived. It briefly characterizes the actions of the County that it believes have abridged its First Amendment rights, but it fails to explain how its choice to vacate a building and hold services elsewhere for a discrete period of time, instead of applying for a Use Permit or otherwise challenging the County's enforcement actions through existing local procedures, effected a deprivation of a liberty interest. Thus, the Church's lengthy discussion of the process to which it believes it is entitled fails to provide the necessary foundation. The Church neither presents an argument regarding which of the County's actions constituted a "deprivation" for procedural due process purposes, nor an argument establishing which interests it might have been deprived of in the first place.

Finally, the Church also argues that the County has violated state law, in turn causing a deprivation of a constitutional right, which forms the basis of a ripe and actionable § 1983 claim under *Hallstrom v. Garden City*, 991 F.2d 1473, 1482 n.22 (9th Cir. 1993). The Church reasons that the County's actions violated California state procedural due process requirements and resulted in the deprivation of the Church's rights to free exercise, speech, assembly, and association, and that we should therefore find that all of the Church's § 1983 claims are ripe based on the alleged procedural due process violation, even absent a final determination of the Church's eligibility for a Use Permit.

As we discussed above, the Church has failed to establish a procedural due process violation under state or federal law, so *Hallstrom* cannot help the Church avoid the final decision requirement, even if it stood for so broad a proposition as the Church contends. Further, even if the Church *had* established a state procedural due process violation, *Hallstrom* would still be of limited help, if any; it does not, as the Church contends, contain a holding that any constitutional violations emanating from a state procedural due process violation are automatically ripened. *See Hallstrom*, 991 F.2d 1482 n.22. That case merely provides that a violation of state law that results in the deprivation of federally protected constitutional rights may give rise to a § 1983 claim for the deprivation of a property or liberty interest. *Id.*[23] The Church provides no argument or legal authority explaining why a final decision would not help to define the injuries, or why a ruling on these claims would not later be mooted by the grant of a valid Use Permit. It provides no support for its argument that the § 1983 claims are independently ripe on this basis. As we have said, "[w]e will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review. As the Seventh Circuit . . . stated aptly: 'judges are not like pigs, hunting for truffles buried in briefs.' " *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam)).

b. *Free Exercise, Speech, Assembly, and Association*

[16] The Church makes no discernible independent argument that its free exercise, speech, assembly, or association

---

[23]In *Hallstrom* we held that an Idaho state statute providing for a timely probable cause hearing before a magistrate created a constitutionally protected liberty interest such that a defendant could not be held indefinitely without presentation to the magistrate merely because the defendant refused to submit to a county's standard booking procedures. *Id.* at 1481-82.

claims were ripe for review. It merely cites to RLUIPA and general precedent recognizing the existence of these constitutional rights, and attempts to distinguish *Williamson County*. Even assuming that the Church alleged facts sufficient to establish that the County instituted enforcement of the zoning regulation, sent the cease-and-desist order, or decided to conduct the premises inspection all due to religious animus, the Church has provided no cases or even a legal theory addressing why its claims would not be better suited for consideration once a final decision on the Use Permit application issues and the extent of the injury is fully defined. Because the Church makes only bare assertions and does not support its free exercise, speech, assembly, or association claims with any distinct legal argument whatsoever, any contention that they were independently ripe is deemed abandoned on appeal. *See Christian Legal Soc'y*, 626 F.3d at 487-88. Accordingly, we do not decide today the open question of whether *Williamson County*'s final decision requirement should apply to First Amendment claims in the land use context.

## IV.   CONCLUSION

We agree with the district court that the Church failed to establish that its RLUIPA claims were ripe absent a final determination from the County on its Use Permit application and hold that the Church failed to make a sufficient showing of the ripeness of any of its other constitutional claims. Because the Church has not even completed the requirements for the County's review of a single application, there is no way to know whether the Church will receive the permit it seeks. If the Church completes the application process, including the attendant environmental tests, and the County denies the Church's request for a Use Permit, the Church may re-file. Similarly, while we do not today foreclose the possibility that the Church might one day present a ripe "cost-as-burden" argument, it has not presented a complete enough record for us to determine that it has done so here: we do not know the finalized, particularized burden the Church will

have to shoulder. The district court was correct in declining to address these claims.

**AFFIRMED.**[24]

---

[24]Accordingly, we do not proceed to determine the merits of any RLUIPA or constitutional claims, and express no opinion as to whether the Church will be able to carry its burden of proving that the County's actions amounted to a substantial burden on its First Amendment rights.